# CHARLES HARRY JONES *v.* STATE OF MARYLAND

[No. 167, September Term, 1969.]

*Decided December 16, 1969.*

The cause was submitted to MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Joseph W. Sachs* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *Raymond G. Thieme, Jr., Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Charles Harry Jones (appellant), Alvin Rendell Carroll and Roscoe Edward Keaton were jointly indicted and charged with possession of narcotics paraphernalia (1st count) and that they "unlawfully conspired together to violate Section 297 of Article 27 of the Annotated Code of Maryland" (2nd count). Appellant was separately tried by a court trial in the Circuit Court for Anne Arundel County and found guilty of the offense charged in the second count.[1] On appeal the questions presented go to the sufficiency of the evidence.

---

1. Carroll was found guilty by a jury in the Circuit Court for Anne Arundel County of the offense charged in each of the counts. A stet was entered to the indictment as against Keaton.

At the trial there was evidence tending to show the following. On the second floor of a building at the Maryland Correctional Camp Center (Camp) are dormitories and bathrooms. Two of the dormitories, called respectively Queen Anne Dormitory and Prince George Dormitory, are connected by a common bathroom. In the center of the bathroom are showers and beside the showers are lavatories and toilet bowls. The dormitories and bathroom each have a door leading into a common hallway and each of the dormitories has a door leading into the bathroom. Jones, Carroll, Keaton and a Charles Bowman were inmates of the Camp on 13 October 1968. About 8:30 P.M. that day two officers of the Camp were making routine rounds through the building. On the second floor, as they were going down the hall, they saw Jones and Bowman, who appeared to be talking to each other. Jones, facing away from them, was leaning against the frame of the door leading from the hallway into the bathroom between the Queen Anne and Prince George's dormitories, more in the hall than in the bathroom. Bowman was in the hall. One of the officers said he had received a report earlier in the week that there "had been some possible narcotics going on in the bathroom or dormitory." He thought Jones was "spotting," meaning acting as a lookout. "It's usual to keep the hallways clear, and it's not too often the doors are unlocked to the bathroom from the hallways, but it's not often you catch somebody standing right in the doorway." The officers ducked into the Queen Anne Dormitory through the door leading into the hall and then into the bathroom through the door leading therein from the dormitory. Jones then saw them and spun around, throwing up his hand as if to say something to somebody standing back in the bathroom. Jones then went into the bathroom. Keaton and Carroll were in the bathroom, coming toward the front from the back wall. All four inmates were taken to the control room and given a "skin shakedown."[2] A piece of

---

2. In a "skin shakedown" the subject is "told to remove each

toilet tissue, seen in Jones' hand by the officers on the second floor, was recovered from Jones' hand. It had "a blood dripping on it." There was a mark and a spot of blood on the palm of Jones' hand "on the fleshy part near the base of the thumb." It was the opinion of the examining officer that the mark "looked as though an object had been used to scratch the skin rather than puncture straight through as you would in a hypodermic." No narcotic paraphernalia was found on the person of Jones. A Maryland State Trooper, experienced in narcotic investigations, testified that narcotics are usually injected into muscles of the leg or arm. Asked by the court, "Is it customary in your experience to insert the needle into the muscle of the thumb?," he replied, "I have never run into an occasion like this before." A similar mark and spot of blood was on Keaton's hand in the same location. A hypodermic needle and syringe were found in Carroll's underwear. There was some blood in the syringe. The Trooper testified that the syringe and needle were of a type used to administer narcotics. There was no evidence as to whether it contained traces of a narcotic drug. Bowman told the officers he had stopped to show Jones some pictures. Polaroid pictures were found in Bowman's possession. At the close of this evidence adduced by the State, the court granted a motion for judgment of acquittal as to the first count of the indictment.

Keaton and Bowman testified for Jones and Jones testified in his own behalf. Keaton stated "that he was the one in the hallway talking to Bowman who was showing him pictures of his wife, that Jones was in the bathroom, that the officers brought Jones out of the bathroom and then Carroll came out of the other dormitory." Keaton had passed through the bathroom and saw Jones sitting on a toilet just before Bowman came up. After cross-

---

item of clothing, one item at a time. Each item of clothing as it is removed is thoroughly checked [for contraband] until we get the man down to the skin." The body of the subject is then checked for contraband.

examination of Keaton, defense counsel stated that he had failed to ask the witness on direct examination about the "injury" on his palm and asked permission to do so on redirect examination. The state objected on the ground of relevancy and the court agreed that it was not relevant. Questions were asked of the witness on the matter, objected to and the objections were sustained. Bowman said also that it was Keaton to whom he talked at the bathroom door. He denied talking to Jones in the hallway. Jones said he had been playing pool and went to the bathroom to relieve himself. The officers came in. They asked him what he was doing and he told them he was using the bathroom. One officer asked him what he had in his hand that was in his pocket and then told him "OK, go ahead." Carroll came from the dormitory and the officers called Jones back as he was walking away and took them all downstairs. He admitted the possession of toilet tissue and that it had blood on it. He said he had "nicked" himself that morning while shaving and "I just ripped a small piece off and dabbed it and I placed it in my pocket." It was elicited on direct examination of him that he was serving a sentence of 18 months "for narcotics." No inquiry was made of him, either on direct or cross-examination, concerning the mark and blood spot on the palm of his hand.

The State called a Maryland State Trooper in rebuttal apparently to impeach the credibility of Keaton. The Trooper said he had talked "briefly" to Keaton. But Keaton told him that Jones was in the bathroom with Carroll.

The court denied a motion for judgment of acquittal. It then found a verdict of guilty as to the second count. It did not state the grounds for its decision. See Maryland Rule 742.

Jones first urges that the evidence was not sufficient to establish that he was the person in the doorway observed by the officers. It is the function of the trier of fact to resolve conflicting evidence. In doing so it deter-

mines the weight of the evidence and the credibility of witnesses. It is not obliged to believe the explanations or denials offered by the defendant. *Taylor v. State,* 7 Md. App. 558; *Rasnick v. State,* 7 Md. App. 564; *Fletcher v. State,* 6 Md. App. 219. As there was credible evidence that it was Jones who was in the doorway talking to Bowman, an officer of the Camp positively identifying him, the court could properly so find. Rule 1086.

Jones further contends that even if he was the one standing in the hallway, the evidence was not sufficient to convict him of the crime of which he was found guilty.

## THE LAW OF CONSPIRACY

Simply stated, conspiracy is a combination by two or more persons to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means.[3] In Maryland it is a common law misdemeanor. *Archer v. State,* 145 Md. 128; *State v. Michael,* 2 Md. App. 750. Today punishment is prescribed by statute, but only by way of limitation and applicable only when the object of the conspiracy is an "offense." Code, Art. 27, § 38, provides:

> "The punishment of every person convicted
> of the crime of conspiracy shall not exceed the
> maximum punishment provided for the offense
> he or she conspired to commit." [4]

Thus it is when the object of the conspiracy is an indict-

---

3. See *Perkins, Criminal Law* (1957) p. 528; *Clark and Marshall, Law of Crimes,* (6th Ed.) § 9, p. 489; 1 *Wharton's Criminal Law* (Anderson) § 82, p. 171.

4. This is the codification of Chapter 691, Act 1961. The Act repealed former § 38 which was the codification of Chapter 651, Acts 1927. Chapter 651, Acts 1927, provided that every person convicted of the crime of conspiracy shall be liable to be punished by a fine not exceeding $2000 or imprisonment for not more than 10 years, or both. Thus the punishment for conspiracy in some cases could be harsher than the punishment for the crime which was the object of the conspiracy. *Scarlett v. State,* 201 Md. 310. It appears that prior to the enactment of Chapter 651, Acts 1927, the punishment upon conviction of conspiracy would be under the common law as in the crime of assault and could be imprisonment for any period not cruel and unusual.

able crime that the punishment for conspiracy to commit such crime may not exceed the punishment permitted for the object crime. If the object of the conspiracy is some other act with regard to which it is unlawful to conspire, the punishment is under the common law and the length of the sentence is left to the discretion of the trial court, except that it may not be cruel and unusual. See *Miller v. State,* 1 Md. App. 653.

In the context of the act to be accomplished, conspiracy is a broad crime. See *State v. Buchanan, et al.,* 5 H. & J. 317; 1 *Wharton, supra,* §§ 93-101, pp. 204-221; *Clark and Marshall, supra,* § 9.04, pp. 502-514. But "[n]othing is better settled in the criminal law than the doctrine that a conspiracy to commit any crime, either as the end or as the means of accomplishing an end not criminal, is a misdemeanor at common law; and it is immaterial whether the intended crime be a felony or merely a misdemeanor, and whether it be criminal at common law or by statute only." *Clark and Marshall, supra,* § 9.04, p. 504.[5] Appellant was charged with conspiring with two other persons to violate Code, Art. 27, § 297,[6] which provides:

> "No person except a manufacturer or a wholesaler or a retail dealer in surgical instruments, pharmacist, physician, dentist, veterinarian, nurse or interne, shall at any time have or possess a hypodermic syringe or needle or any instrument or implement adapted for the use of a habit-forming drugs by hypodermic injections and which is possessed for the purpose of

---

5. An exception is as to those crimes which fall within the concert of action rule—"An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *Robinson v. State,* 229 Md. 503. But the concert of action rule is also subject to exceptions. See *Perkins, supra,* pp. 535-536; 1 *Wharton, supra,* § 89, pp. 191-194; *Clark and Marshall, supra,* § 9.06, pp. 515-517.

6. As to the form of the indictment see Code, Art. 27, § 40; *Scarlett v. State, supra; McGuire v. State,* 200 Md. 601; *Lynch v. State,* 2 Md. App. 546.

administering habit-forming drugs, unless such possession be authorized by the certificate of a physician issued within the period of one year prior hereto."

It is clear that the offense as charged is a common law misdemeanor.[7] Since the common law gist of conspiracy is unlawful combination, no further overt act is required to constitute the crime. *Harper v. State,* 6 Md. App. 1. Combination results from an agreement. But conspiracy is the combination resulting from the agreement, rather than the mere agreement itself. However, there must be a meeting of the minds—a unity of design and purpose—to have an agreement, but it is not necessary that a formal agreement be shown. It need not be manifested by any formal words, written or spoken. "It is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances, although evidence which merely creates suspicion will not be adequate." *Perkins, supra,* at p. 530. In *Seidman v. State,* 230 Md. 305, 322, the Court said:

"A conspiracy may be shown by circumstantial evidence from which an inference of common design may be drawn and it is not necessary to demonstrate that the conspirators met and agreed in terms to a design and to pursue it by common means."

In *Lawrence v. State,* 103 Md. 17, 22, the Court said:

"Concurrence of action on a material point is sufficient to enable a jury to presume concurrence of sentiment, and from this the actual fact of conspiracy may be inferred."

See also *Hill v. State,* 231 Md. 458, 461, in which those

---

7. See *Robinson v. State, supra,* at 514-515 in which there is the clear implication that possession of lottery slips may be the object of a conspiracy by holding that it does not fall within the concert of action rule.

principles of law were applied in finding that certain overt acts of concurrence of action by three persons, of whom defendant was one, on material points showed guilty knowledge on the part of the defendant, and that they were all acting in concert; *Boddie and Brooks v. State,* 6 Md. App. 523; *Harper v. State, supra; Price v. State,* 4 Md. App. 701.

In the instant case the lower court could have properly drawn from the evidence before it an inference of a common design on the part of Jones, Carroll and Keaton. Or otherwise stated, it could have found a concurrence of action from the circumstances in which the officers observed the three men, their actions and the tangible evidence seized, which showed guilty knowledge on the part of Jones, and that he and Carroll and Keaton were acting in concert. From this it could have inferred the actual fact of a combination. The pertinent question is, however, a combination to accomplish what act? But our inquiry on the question is limited to whether the act was a crime proscribed by Code, Art. 27, § 297 for it was conspiring to violate that statute of which appellant was convicted. It is only by determining that the lower court could have found beyond a reasonable doubt from the evidence, directly or by rational inference, that the combination was to accomplish a crime proscribed by that statute that we could say that the conspiracy charged was established. We do not believe that the evidence was sufficient for the lower court to so find.

It is clear appellant did not meet his burden of proving that he or either of the other two persons fell within the exceptions or excuses set forth in the statute. Code, Art. 27, § 298. Thus the State's burden was to prove that the three conspired together to "have or possess a hypodermic syringe or needle * * * for the purpose of administering habit-forming drugs." It was not disputed that a hypodermic syringe and needle were found in the actual possession of Carroll and it is inherent in the acquittal of appellant of the offense charged in the first

count that the lower court found that the paraphernalia was not in the constructive possession of appellant. But see *Williams v. State,* 7 Md. App. 5, 13-14. However, the conspiracy count as alleged could be established by showing a conspiracy to have any of Jones, Carroll or Keaton possess the paraphernalia. The question thus encompasses two issues: (1) was the evidence sufficient to prove a conspiracy to this end, and (2), if so, was it sufficient to prove that the hypodermic syringe and needle were "possessed for the purpose of administering habit-forming drugs."

We discussed the meaning of "possession" in *Williams v. State, supra.* Stating that, in the context of the narcotic laws, it has been held that it must be given its ordinary meaning, we said it means "the act or condition of having in [possession] or taking into one's own control or holding at one's disposal." The only evidence tending to show that appellant, Carroll and Keaton combined as a result of an agreement, express or tacit, to have the paraphernalia in the possession, or to take it into the control of any of them or to hold it at the disposal of any one of them, was the fact of actual possession in Carroll and the circumstances under which they were observed together. There was no evidence, direct or circumstantial, tending to show how Carroll came into possession of the paraphernalia or when he came into possession of it. The conspiracy here alleged was not to use the paraphernalia to administer habit-forming drugs, but merely to possess it. A conspiracy is *to accomplish* an act; the act is to be accomplished *in futuro;* the purpose of the conspiracy is *to do* something. "Persons cannot be guilty of conspiracy to commit a crime which has already been committed." 1 *Wharton, supra,* § 82, p. 176. "Mere cognizance of the commission of a crime * * * does not make the person having such knowledge, a co-conspirator of the criminal." *Id.,* § 84, p. 181. This does not mean that the consummation of a crime precludes prosecution for a conspiracy to commit it. In fact the overt acts in the commission of the crime are relevant

and material to the proof of the conspiracy. *Hill v. State, supra.* A criminal conspiracy is an offense distinct from the crime contemplated and the doctrine of merger is not applicable. Id., § 87, p. 188; *Perkins, supra,* pp. 533-534. A prior conviction of a crime does not entitle the accused to the defense of *res judicata* in a subsequent prosecution for conspiracy, even though the same evidence was introduced as part of the proof of the conspiracy. *Rouse v. State,* 202 Md. 481. Nor does the acquittal of a particular crime bar a subsequent prosecution for a conspiracy to commit it. *Scarlett v. State, supra.* What it does mean is that there must be evidence, direct or circumstantial, or rational inferences therefrom, sufficient to show that the combination to commit the crime was formed prior to the commission of that crime. There is no such evidence here. Assuming that appellant knew Carroll had the syringe and needle, assuming that appellant and the other two conspired together to administer narcotic drugs, see Code, Art. 27, § 276, assuming that appellant was the lookout while Carroll and Keaton were in the bathroom administering narcotic drugs, assuming that appellant had already administered a narcotic drug to himself or voluntarily had it administered to him by either of the other two, assuming that the administering of the drug had been by the use of the syringe and needle, all this would not show directly or circumstantially nor would there be a rational inference therefrom, that appellant and Carroll and Keaton conspired together to have or possess the syringe and needle before its actual possession by Carroll. It may have been a rational inference that appellant knew that Carroll possessed the paraphernalia, but this would not show that he conspired with Carroll or Keaton for Carroll *to possess it,* that is for Carroll to have it in his possession. In short, although the evidence may have been sufficient to establish that they combined to use the hypodermic sy-

ringe and needle unlawfully,[8] we do not believe that it was sufficient to show that they combined to obtain those articles so as to possess them in violation of the statute charged. We do not think that the circumstances here were sufficiently significant to raise an inference of an understanding *in regard to the unlawful purpose charged;* although the circumstances may have created suspicion that Jones and Carroll and Keaton conspired to have and possess the syringe and needle, this was not enough. We hold that the evidence was insufficient to sustain the conviction as a matter of law.

In view of our holding we do not reach the question whether the evidence was sufficient to show that the paraphernalia was possessed for the purpose of administering habit-forming drugs. But see note 8, *supra.*

We cannot determine from the record whether or not additional probative evidence can be produced on a retrial. We think that the interests of justice appear to require that the judgment be vacated. We remand the case with directions to the trial court (a) to hold a new trial if the State within a time to be specified forthwith by the trial court can satisfy the court that it can produce additional probative evidence (such time to be as it finds in the exercise of judicial discretion to be reasonable in the circumstances), or (b) to enter a judgment of acquittal if the State cannot preliminarily so satisfy the court. *Gray v. State,* 254 Md. 385, 397.

> *Judgment vacated; case remanded for further proceedings in accordance with this opinion.*

---

8. We point out, however, that there was no evidence as to narcotic drugs being found in the needle or syringe or in the actual or constructive possession of any of the three.