# OLIVER F. PERKINS *v.* STATE OF MARYLAND

[No. 901, September Term, 1974.]

*Decided June 3, 1975.*

pp. 528-530

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*R. Roland Brockmeyer, Assigned Public Defender,* for appellant.

*James I. Keane, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *J. Owen Wise, State's Attorney for Caroline County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Oliver F. Perkins was convicted by a jury of the Caroline County Circuit Court for unlawful distribution of marijuana, conspiracy to violate the controlled dangerous substance laws and of maintaining a common nuisance. The indictment contained nine counts; five of distributing marijuana, one of conspiracy and three charging common nuisance.

Appellant was arrested by warrant prior to the issuance of any indictment or information. A preliminary hearing

thereafter resulted in a finding that there was insufficient evidence of probable cause to justify the detention of the accused on all but two counts,[1] *viz.* 4 and 5 charging distribution to Trp. Davis and conspiracy with Kermit Rogers. Despite the outcome of the preliminary hearing, the State three weeks later charged appellant by means of criminal information, Md. Rule 708 with the same series of crimes for which he was originally arrested. Appellant evidently preferred the result of the preliminary hearing and, when arraigned, pled only to Counts 4 and 5.

Two months later an indictment was handed down by the grand jury charging appellant with all nine counts, for each of which the petit jury found him guilty. The sentence imposed was three years on each of counts 2 and 3 to run consecutively and "fine of $500.00 on each count; sentence suspended generally under remaining counts." It is thus obvious why appellant strenuously contends that:

"I

Having chosen to charge the accused by criminal information and preliminary hearing, . . . the State [was] prevented by collateral estoppel from thereafter obtaining a grand jury indictment."

The record does not reflect that appellant requested a preliminary hearing; however, he contends that having been granted one, the State is estopped from proceeding against him on any matters therein dismissed. Presumably, his reasons are grounded upon both double jeopardy which he raised by reference to *Benton v. Maryland*, 395 U. S. 784 and collateral estoppel by reliance upon *Ashe v. Swenson*, 397 U. S. 436, and *Waller v. Florida*, 397 U. S. 387. We find these last two authorities inapposite, however, since each deals with collateral estoppel to litigate an issue previously determined by a valid and final judgment between the same

1. Although the docket entry shows "1974 Jan. 15" Transcript of record from District Court charging (1) Marijuana distribution and (2) Conspiracy fd.", we assume the dismissal of all counts except 4 and 5 based on argument raised below on motion to dismiss and briefs here submitted and not contradicted by the State.

parties. A preliminary hearing is obviously not a final judgment in any sense.

The double jeopardy argument, while equally unpersuasive, is not so readily dismissed, although both the Supreme Court and the Maryland Court of Appeals have decided that jeopardy does not attach to the findings of a district court at the preliminary hearing level. *United States v. Serfass,* 420 U. S. 377, 43 LW 4315; *Wampler v. Warden,* 231 Md. 639. Double jeopardy applies only after jeopardy has attached, *Cf. Blondes v. State,* 273 Md. 435, and that occurs when the defendant is "put to trial before the trier of the facts. . . ." *United States v. Jorn,* 400 U. S. 470. In *United States ex rel. Rutz v. Levy,* 268 U. S. 390, 393, the Supreme Court said:

> "Under state law it has uniformly been held that the discharge of an accused person upon a preliminary examination for want of probable cause constitutes no bar to a subsequent preliminary examination before another magistrate. Such an examination is not a trial in any sense and does not operate to put the defendant in jeopardy."

In *Wampler,* 231 Md. at 648 the Court of Appeals wrote:

> "Maryland practice has always, so far as we are informed, been in accord with the [Rutz] rule above stated; indeed this appears to be the first time that the rule has ever been challenged in this Court. The absence of any prior decision of this Court on the point indicates the long and general acceptance of the rule, for there have been many instances in which indictment and prosecution have followed the discharge of an accused person following a preliminary hearing before a magistrate. We adhere to the general and well settled rule."

1 Wharton, *Criminal Law and Procedure,* § 137 is in accord:

> "No jeopardy arises when the first proceeding is merely a preliminary investigation which is

dismissed in favor of the accused, who is then later indicted in spite of such earlier disposition of the matter."

When charging a prospective defendant with a felony, other than a felony within the jurisdiction of the District Court, the State may proceed by way of criminal information, subject to the defendant's right to a preliminary hearing, Art. 27, § 592 (a). When an accused waives his preliminary hearing right by not requesting it within the prescribed 10 day period, Art. 27, § 592 (b) (1), or the preliminary hearing results in a finding of probable cause, the Prosecutor's information consummates the charging process. Md: Rule 708.

In the case at bar, the appellant's preliminary hearing resulted in the opposite finding: no probable cause and the dismissal of most charges. At that point the State was obviously without authority to charge a Circuit Court felony by way of information. Had the State left it at that, appellant might have had an argument. Apparently, however, the State realized its error and proceeded to obtain an indictment. Since the information coupled with a probable cause hearing is simply an alternative to grand jury indictment which the prosecutor may or may not choose to utilize, a deficiency in the information has no bearing on the validity of a subsequent indictment.

In attempting to expedite criminal trials while preserving an accused's right to grand jury indictment — a process not acclaimed for expedition — the General Assembly by statute, Art. 27, § 592, and the Court of Appeals by Rules 708 and 709, enlarged the State's prerogative of charging by information, but tempered that authority with the prerequisite of a finding of probable cause at a preliminary hearing,[1A] or a waiver of that hearing.

Prior to the expansion of the State's information authority, the primary purpose of the preliminary hearing was to protect the accused from a unilateral decision to

---

1A. The right to a preliminary hearing so retained removes us from the ambit of Gerstein v. Pugh, 420 U. S. 103, 95 Sup. Ct. 854.

arrest with the accompanying likelihood of incarceration while awaiting grand jury action, or as the Court of Appeals phrased it, of:

> "insuring him against being *committed* for action by the grand jury on charges which are groundless." [Emphasis added]. *Williams v. State*, 214 Md. 143, 154.[2]

The liberal provisions which now exist for release of an accused on his own recognizance prior to trial, Art. 27, § 638A while not preventing the arrest, frequently prevent the commitment.

### Conspiracy

Appellant questions the sufficiency of the evidence to prove that a conspiracy existed between appellant and one Kermit Rogers. The difficulty arises from the exclusion of testimony of conversations with, and statements by, appellant's alleged co-conspirator. The exclusions left us with but inferential evidence of circumstances from which a jury could determine the existence of a conspiracy. *Jones v. State*, 8 Md. App. 370, 377-378. The State's case included two segments of testimony from which an inference of conspiracy could arise.

One undercover officer testified that he asked the alleged co-conspirator Rogers if he had any "pot." An objection to the balance of the conversation was sustained; however, the witness was permitted to say that:

> "A conversation took place between the occupant of the vehicle that I was in [Rogers] and Mr. Perkins, concerning purchase of a quantity of marijuana."

---

2. Williams, decided in 1957, and Wampler v. Warden, 231 Md. 639 decided May 15, 1963 obviously were not discussing Md. Rule 708 and 709 as presently written since they were amended to their present form in 1972 and 1973. Nor were those cases discussing the present Art. 27, § 592 which was enacted in its present form in 1973, Ch. 840. The original § 592, discussed in the cases cited, was repealed by Acts 1953, Ch. 551, § 1. Its purpose was to permit charge by information but the procedure arose from the action of the accused who had to seek it by an elaborate petition. He may still waive the grand jury indictment, less elaborately under Rule 709 to expedite proceedings.

There followed an evidentiary colloquy among court and counsel which we omit. The witness then continued:

"A. After the conversation, Perkins went to the trunk of his — at the rear of his 1970 Pontiac and opened the trunk and removed a clear plastic bag, containing what appeared to be — appeared to me to be marijuana. And he got it from the trunk, he brought it over to the car and he handed it to me. And I was examining the contents of the bag and after looking at the substance, and I was pretty sure in my mind it was, in fact, marijuana, I gave the Defendant, Mr. Perkins, $20.00 bill in US currency. And this took place approximately 7:50 P.M. And a short time after this transaction took place, contact with the Defendant was terminated.

Q. And how long were you and Mr. Perkins in each other's sight or in contact with each other on this date?

A. It was approximately five or ten minutes.

Q. Was there any particular reason you only paid him $20.00 on this occasion whereas you paid him forty the preceding week?

A. Well, because I only purchased one ounce of marijuana this time and the previous time, it was two.

Q. How far from your vantage point was the vehicle from which he obtained this substance?

A. He parked right adjacent to the vehicle that I was in. I was seated in the driver's side and he parked right next to the — to the driver's side.

The Court: Did he recognize you?

A. No sir, I don't believe he did. At the time.

The Court: This having been a customer on a prior occasion.

A. Well, he — he knew other people that were in the car.

The Court: Knew other people in your car?

A. Yes sir.

The Court: Well, who was in the car with you?

A. Kermit Rogers was in the car and another person by the name of Anthony.

The Court: MMMm—He came over and spoke to them?

A. Yes sir, he did.

The Court: What did he say?

A. Kermit —

The Court: No, what did Perkins say to them?

A. Well, he was asked if he had any marijuana and the Defendant said, Yeh, how many do you want? And I told him just one. Meaning one ounce of marijuana.

The Court: What did he say to that?

A. He then — he then — I can't remember what he said then, but he went to his — then he went to the rear of the Pontiac and opened the trunk and obtained the ounce of marijuana and brought it back over to me and at that time, I gave him the $20.00."

The second instance involved the testimony of another undercover officer:

"A. On November 20th, I returned to Denton, Caroline County and was at the area known as Truxton's Bar, when I met with another subject, named Kermit — George Kermit Rogers. Mr. Rogers advised me that he did not have —

Mr. Hairston: Objection to what Mr. Rogers advised him.

The Court: You can't testify to what Rogers said.

A. Yes sir.

The Court: At this point, anyway.

Q. After talking to Mr. Rogers what did you do?

A. Drove to an address on High Street and Third here in Denton, Caroline County. I parked my

vehicle next to a 1970 Pontiac that was the same vehicle that I had seen Mr. Perkins operate on November the 13th. At this time, Mr. Rogers got out of my vehicle, went into the residence — a residence where the Pontiac was parked. Mr. Rogers and Mr. Perkins walked out of the residence. Mr. Perkins went to the rear of the Pontiac, opened the trunk and the trunk light was on. I observed Mr. Perkins reach into a brown bag, bring up two plastic envelopes — plastic baggies — hand the two plastic baggies to Mr. Rogers. Mr. Rogers handed Mr. Perkins some money which Mr. Perkins put into his pocket. Mr. Perkins then took out the large brown bag that had contained the plastic bags and took it into the residence and that was the last time I saw Mr. Perkins on that date."

These two instances provide sufficient circumstances from which a jury could properly find that a conspiracy existed.

After defining conspiracy as "a combination by two or more persons to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means," [Chief] Judge Orth in *Jones v. State*, 8 Md. App. at 377, 378 provided the answer to appellant's concern whether that evidence of conspiracy was sufficient:

"Combination results from an agreement. But conspiracy is the combination resulting from the agreement, rather than the mere agreement itself. However, there must be a meeting of the minds — a unity of design and purpose — to have an agreement, but it is not necessary that a formal agreement be shown. It need not be manifested by any formal words, written or spoken. 'It is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances, although evidence which merely creates suspicion will not be adequate.' *Perkins, supra*, at p. 530. In *Seidman v. State*, 230 Md. 305, 322, the Court said:

> 'A conspiracy may be shown by circumstantial evidence from which an inference of a common design may be drawn and it is not necessary to demonstrate that the conspirators met and agreed in terms to a design and to pursue it by common means.'

In *Lawrence v. State*, 103 Md. 17, 22, the Court said:

> 'Concurrence of action on a material point is sufficient to enable a jury to presume concurrence of sentiment, and from this the actual fact of conspiracy may be inferred.'

> See also *Hill v. State*, 231 Md. 458, 461, in which those principles of law were applied in finding that certain overt acts of concurrence of action by three persons, of whom defendant was one, on material points showed guilty knowledge on the part of the defendant, and that they were all acting in concert; *Boddie and Brooks v. State*, 6 Md. App. 523; *Harper v. State, supra; Price v. State*, 4 Md. App. 701.

> In the instant case the lower court could have properly drawn from the evidence before it an inference of a common design. . . ."

Appellant concludes his conspiracy issue by arguing that "[t]his would not be a conspiracy since you cannot have a sale unless you have both a seller and a purchaser." Wharton's rule or the concert of action rule provides that:

> " . . . a combination to commit an offense which can only be committed by the concerted action of two persons does not amount to conspiracy if only those two are involved." R. Perkins, *Criminal Law* (2d ed.) at 620.[2A]

Whether appellant's argument would be correct when considered in the abstract, it has nothing to do with his case. The alleged conspirators here were not the buyer and seller, but two sellers, appellant and Kermit Rogers.

---

**2A.** For an extended discussion of the rule and the policy reasons for it, see Iannelli v. United States, 420 U.S. 770, 43 LW 4423.

## Entrapment

We find it difficult to follow appellant's argument that he was a "victim of entrapment." Presumably he is contending that because the officers simulated smoking marijuana in his presence and an officer "lulled" and "beguiled" him into believing that the officer, like himself, acquired the smoking habit in Viet Nam, he was "entrapped."

Appellant concedes that "the question of entrapment is a jury question." Apparently he recognizes that he had the initial burden of showing that the police did "induce the Defendant to commit the offense charged in the indictment . . .," *Simmons v. State*, 8 Md. App. 355, 362, since he asserts that the State failed to meet its responsive burden, *viz.*, to show that he had "a predisposition to commit the offense . . . due to his own readiness. . . ." *Simmons, supra.* Appellant then cites *Simmons, supra,* and *Byrd v. State*, 16 Md. App. 391 as authority for his conclusion that this is a case wherein the "criminal design originates with the officials of the government, and they implant in the minds of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sherman v. United States*, 356 U. S. 369, 372. He would not merely persuade us as a matter of fact, but would also have us reach that conclusion as a matter of law, as was done in *Sherman.* However, in *Sherman,* the entrapment defense was considered on the basis of undisputed testimony and thus was established as a matter of law. We noted in *Simmons, supra,* on that very subject that:

> "In our jurisdiction, where the jury are the judge of the law as well as the facts, we think that both questions pertaining to the issue of entrapment must be for the jury." *Simmons*, 8 Md. App. at 365, n. 7.

The two questions dealt with in *Simmons* were "(1) did the appellant meet the burden of showing that he was induced by the police directly or through their agent to commit the offense? and (2) did the State meet its burden of showing

that the appellant's criminal conduct was due to his own readiness and not to the persuasion of the police or their agent?" *Byrd v. State,* 16 Md. App. at 403.

The evidence submitted to the jury was clearly sufficient to permit a finding that either the appellant did not meet his burden or that the State did meet its. Appellant failed to show the requisite "repeated and persistent solicitation of a previously law abiding citizen in order to overcome his reluctance to commit a crime." *Stewart v. State,* 232 Md. 318, 321. As there was no inducement there was no entrapment and the conviction would be proper on that ground.

Even assuming that there was an inducement, we reach the same conclusion we did in *Simmons,* 8 Md. App. at 367

"[T]he evidence was sufficient for the trier of fact to find beyond a reasonable doubt that the accused had a predisposition to commit the offense — that he was ready and willing without persuasion and awaiting any propitious opportunity to sell marijuana. We believe it clear that the trier of fact could have properly found that the criminal conduct of appellant was not 'the product of the *creative* activity' of the police agent but that the police agent merely afforded opportunity for the commission of the offense. We have no difficulty in determining on which side of the line drawn between the trap for the unwary innocent and the trap for the unwary criminal appellant falls; he is on the side of the trap for the unwary criminal. Thus entrapment was not established and the conviction would be proper for this reason."

Here appellant took the stand and admitted not only to the use of marijuana but that he sold it to friends:

"A. No, I never have. I feel that way because I've been — I've been smoking it for quite awhile and it never bothered me and I — I — and when I went to California, I just got the idea when I was there that it would be legalized because they had a petition at

the time that everybody signed before it legalized marijuana. So when I came back home I didn't hide the fact that I did smoke marijuana and I had some friends that would, you know, ask me if I had, you know — you know, occasionally or something like this and I would do it just for a friend's sake, not —

The Court: Do you mean — you say you'd do it, you mean let them have it?

A. Yes sir.

The Court: That what you mean?

A. Yes sir.

The Court: Would you give it to them or sell it?

A. I would give it to them, sir. If — if —

The Court: At $20.00 an ounce, you were giving it to them?

A. Yes sir, 'cause that's what I give for it, sir. In other words, it was —

The Court: Would you give then an ounce or just a cigaret?

A. I would give — if they asked — whatever they asked, sir, if a friend, I would — I believe a person, the way I feel about people, if you're a friend of mine, if I call a friend, I would give it to you. I feel like if I could come up to you and ask you for $30.00, if I'm a friend, if you have any faith in me, you would lend it to me."

Such an admission is hardly compatible with the stance of a reluctant law abiding citizen being overcome by repeated and persistent solicitations.

## Lab Reports

Appellant asks "Was the chemist's report admissible without a proper foundation being laid for admission of the confiscated goods?" Since he had by stipulation agreed in open court to the admission of the lab reports the question is imprudently raised.

## Argument

Appellant claims that the State's rebuttal argument was "so improper and inflammatory as to prevent the jury from returning an impartial verdict." In the abstract, the argument may cause some concern. In context it appears less intemperate.

Appellant's complaints seem to fall into three categories:

1. The prosecutor's defense of the police officers on rebuttal.
2. The prosecutor's expressed concern for the "ruination of children . . . that get hung on marijuana and have to . . . find a way to pay . . . to maintain the habit. . . ." and
3. The allusion to the sales to the police officers whom appellant "thought were people like you and I, like our children and our brothers. He sold to them nevertheless and he would sell to your children or relatives just as quickly."

To gain perspective, we must first review the remarks appellant had made and to which the State was responding. Appellant's closing argument was long and detailed. It centered substantially around two issues, entrapment and the appellant's philosophy of selling only to friends. On the entrapment issue appellant commenced by attacking the police for "enticing people into committing" crimes rather than enforcing the law. As the cresendo of attack rose and the accusations of inducement increased the record reflects that appellant's counsel physically pointed his accusing finger toward the officers. He said:

"The trap was well laid. They used the people, they used the sympathy, they used everything at their disposal just to get someone across the line so they could hit him with a sledge hammer the moment he crossed the line. That's what's been done. It's said in a number of ways. It's said that we have police officers that have to engage in this kind of an activity. I suggest to you Ladies and Gentlemen it

is not really a proper activity for the police officers of this State or any State to be enticing, to be inducing, to advocate, to even suggest, to even to say Can you break the law for me? This is what was said. Can you break the law for me? If that's the position that we want our police officers to be in, to say go out and break the law, I'm asking you to do it, I'm giving you a song and a dance, I'm telling you lies. Did he tell any lies? To him? Sure he did. He said I went to Vietnam, I'm a Patrol man, combat duty and I smoked some good strong stuff over there."

He depicted the actions of the police as

" . . . a guise, it's a ruse, it's a con job — it's a con job to get somebody to do something they wouldn't otherwise do. That's what it is. It is one great big con job to con this man into doing something — to con him into doing something that he wouldn't otherwise do."

When the State commenced to respond to that portion of appellant's argument it was interrupted

"Mr. Wise: I find lately I — spend more time defending the police than I do prosecuting criminals and I wish to say a word or two to you for those who must remain silent and are unable to speak for themselves. The undercover men came into this County at the request of me and the Sheriff. They didn't just come into —

Mr. Hairston: Objection, Your Honor, I don't believe there's any testimony on this and I think we're getting way beyond the scope of any permissible argument.

The Court: I'm going to overrule the objection."

The objection came after the prosecutor stated that the undercover men came into the county at the request of the State's Attorney and the Sheriff. While the fact was

not in evidence [3] it was hardly prejudicially inflammatory. Judge O'Donnell for the Court of Appeals said that a prosecutor in closing argument could draw upon:

" . . . Reasonable and legitimate inferences from the facts which had been offered in evidence, from the facts which were of such general notoriety as to be matters of common knowledge and matters with the cognizance of the jury from their own observations." *Wilhelm v. State,* 272 Md. 404, 445.

The statement objected to gave us far less concern than the balance of the State's rebuttal argument although the latter came in without objection and for that reason, though argued on appeal, it is not properly before us. Our concern compelled that we review it, however, and in context that concern was somewhat assuaged. It reads in its entirety as follows:

"Mr. Wise: The Defense Counsel would have you believe that the undercover narcotics men have nothing to do but go around and pick on poor people like Oliver Perkins. I assure you such is not the case. They had a reason to be here. The reason they were here is quite apparent in the nine charges which are before you. Obviously, there is a lot of illegal activity going on, and obviously, they perform their work very well. Rather than being chastised for good police work, I think they should be rewarded for it. The very purpose of having laws

---

**3.** It is ironic that appellant objects to facts not in evidence after discussing with the jury his personal experience, his private practice and a previous case, none of which were evidence or even relevant.

"I was on vacation last week and I came back on Monday and a client of mine was a victim of assault and battery. We tried it in Cambridge. And in this particular case, a woman walked through the front door. She went in there and was asked to leave, was slapped on that occasion and went over and attempted to phone the police. The phone was hung up on her, she was choked, taken in to — on assault and battery charge. The woman was convicted and given a $25.00 fine. That's Monday of this week. Tuesday of this week, right here in this Court room, a young man was sentenced to three years for one Count of Distribution of marijuana."

and the purpose of having police is to prevent the violation of them. If you want police officers and law enforcement officers to sit around until some guy jumps off a building because he's blown his mind on marijuana, we can have that kind of law enforcement. Defense Counsel was worried about the Defendant and the ruination of his life. I think the Defendant has already ruined his life if you want to call it that. And I'm worried about the ruination of the children, the young adults, teenagers, people that make $80.00 a week that get hung on marijuana and have to pay — to find a way to pay $20.00 an ounce to maintain the habit as Mr. Perkins has and which he admits to. I submit there's a very good reason why, even assuming Mr. Perkins wasn't making any profit on this — he was buying it for $20.00 and selling it for $20.00 — after you get a person hooked on marijuana or any other drug, he's got to have a source to keep it up. If you've got a monopoly, then you can raise the price on it. And that's when you make your money. So there's a good motive why he would have been so-called doing this for free for his friends. Finally, so I won't detain you much longer, Defense Counsel has made much of the fact that if it were not for the police officers, this would not have happened. He raised that specific question to you. And I submit the answer is exactly what I am talking about and very disturbing to me and the reason why you shouldn't condone this. Mr. Perkins didn't know they were police officers, he thought they were people like you and I, like our children and our brothers. He sold to them nevertheless and he would sell to your children or relatives just as quickly. That is why 45 years or not, he belongs off the street."

Appellant complains now (although he failed to do so at trial):

1. First that "the State was asking the jury to

bring in a verdict not based on innocence or guilt but as a reward to the police officers. . . ." The phrase alluded to in context clearly dispels that inference.

2. That "no where in the State's case is there any reference to other sales being made . . ." but would confine the jury to his own testimony that he only sold to friends. While that fact has little relevance to the charge of distributing, it seems clear that the five sales to police officers gives rise to a permissible inference that appellant might sell to anyone.[4] *Williams, supra.*

3. Finally appellant cites *Holbrook v. State,* 6 Md. App. 265, 278 to dispel from us any notion that the State would be justified for its dramatizations or its deviations from evidentiary facts in responding to appellant's accusations, if not excesses.

"We cannot say that the argument of the prosecutor was justified because defense counsel 'was given considerable latitude in reading from Trial Magazine, relating their personal experience of the Bunny Club, reciting prayers of Benedictine Monks, and quoting poetry in their closing argument.' Nor can we find, on the record before us, that there was no ground for complaint because the improper remarks of the prosecutor were provoked by similar remarks of defense counsel or replied to in like manner."

We recognize and repeat that provocation does not justify prejudicial excesses in response. Nor do we retreat from our

---

4. The objects of the concern expressed by both appellant and the State were similar. The State was "worried about the ruination of the children, the young adults, teenagers . . . that get hung on marijuana. . . ." Appellant was concerned lest "anybody's sons and daughters, brothers or sisters, or any other loved ones" would be entrapped and brought before that court and that jury for judgment.

refusal to accept the eye for an eye argument, *i.e.*, because unwarranted latitude is given one it may be offset by allowing equal excesses to the other.

Here, however, when the defense of entrapment is buttressed by appellant's seething attack on the police officers whose testimony comprised the State's case, to require the State to stand mute in the face of that attack would tend to imply that appellant's charges of, "guise, ruse, con job . . . lie used to induce . . . charade . . . trap . . . enticing people into committing [crimes] . . . so they could hit him with a sledge hammer the moment he crossed the line," were well founded.

Both appellant and the State went beyond the bounds of propriety, though neither went beyond the limitations set by *Holbrook, supra.* A jury argument may be more persuasively delivered in quiet tones of equanimity, yet that is sometimes alien to our human capacities for outrage and indignation.

## Sufficiency of the Evidence

Having discussed the conspiracy, noted testimony of five sales of marijuana to police officers and referred to an admission of appellant that he sold to friends, it seems we need add little to fulfill the sufficiency requirement. We should note, however, that the appellant's automobile was the repository from which appellant extracted the marijuana each time he sold it, and it contained envelopes, bags and baggies used for packaging to sell. Such was the common nuisance maintained.

*Judgments affirmed.*