WILLIE MAURICE BEARD *v.* STATE OF MARYLAND

[No. 893, September Term, 1978.]

*Decided April 17, 1979.*

The cause was submitted on briefs to GILBERT, C. J., and THOMPSON and WILNER, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Alice G. Pinderhughes, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *John F. Hanson, Assistant State's Attorney for Baltimore County,* for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant was caught in a Beartrap; and, as a result, he was convicted by a jury in the Circuit Court for Baltimore County

of two counts of assault, two counts of robbery, and two counts of conspiracy to receive stolen goods. He was sentenced to prison for 15 years for each assault conviction, 10 years for each robbery conviction, and 10 years for each conspiracy conviction, all of these sentences to be served concurrently. In this appeal, he raises the following four issues:

1. Did the trial court err in not merging the assault convictions into the robbery convictions?

2. Was the evidence sufficient to sustain appellant's conviction of conspiracy to receive stolen goods?

3. Did the trial judge err in permitting appellant to make his own closing argument without first determining that appellant had knowingly and intelligently waived his right to counsel?

4. Did the trial judge err in not *sua sponte* taking action to correct prosecutorial misconduct?

Beartrap was an undercover fencing operation run jointly by the F.B.I. and the State and County police departments. It operated in the Lansdowne section of Baltimore County under the name of Exports Limited. Its purpose was to purchase stolen goods, identify, if possible, the receivers and the thieves, return the property to its rightful owners, and apprehend and prosecute the criminals. It has, under various covers, become in recent years a popular and effective law enforcement technique.

Through the testimony of State Troopers Voltaggio and Capelli and F.B.I. Agent Cherigo, it was established that, at 10:42 a.m. on May 13, 1977, one James Williams entered Exports Limited and offered for sale a large quantity of merchandise consisting of television sets, stereo equipment, fur and leather coats, and various men's and women's suits. A deal was struck, he was paid $1,000 for all that he had, and he left. Agent Cherigo, looking through some sort of "peephole", saw Williams leave and engage in a conversation with appellant, who was outside in a car. About four minutes later, Williams, this time joined by appellant, reentered the

"store". According to Voltaggio, appellant complained about the price paid for the merchandise: "He stated he could get more money for his merchandise on the street than bringing it to our place." Nevertheless, Voltaggio remained firm, and appellant and Williams ultimately left with just the $1,000. During this conversation, appellant described the fur coats that were part of the loot purchased.

This entire transaction — the original one with Williams and the subsequent conversation with Williams and appellant — was recorded on videotape. That tape was entered into evidence and played for the jury. It apparently corroborated in full the testimony of the police officers.

Williams and appellant were described as black males, Williams being taller than appellant. Both Trooper Voltaggio and Agent Cherigo identified appellant in court as the person who had accompanied Williams the second time. Voltaggio said that appellant had been in twice before, both times with Williams, and had previously offered goods for sale. Appellant was wearing white pants on this current occasion.

Charles and Shirley Smith then testified that at about 8:45 or 9:00 a.m. on that same day — May 13, 1977 — Charles answered a knock at his front door. As he opened the door, two black males burst in, one of them holding a pistol to his head. One was tall, the other shorter; the short one had a stocking mask over his head. Mrs. Smith noted that both men were wearing white overalls.

The two men tied the Smiths, put a pillowcase over Mr. Smith's head, ransacked the house, and took from it cash, jewelry, fur and leather coats, suits, a color television set, and a stereo amplifier.

The combined testimony of the police officers and the Smiths established that the property purchased by Beartrap an hour or two after this robbery was, in fact, that belonging to the Smiths and taken from them in the robbery.

With this background, we may proceed to consider the issues raised by appellant, adding such additional facts as may be necessary as we go along.

### (1) Merger of Assault and Robbery Convictions

The evidence showed rather clearly that the assaults committed upon Mr. and Mrs. Smith, charged under counts 8 and 9 of the indictment, were part and in furtherance of the robberies on those two victims charged in counts 13 and 14 of the indictment. There was no evidence of any independent assault on either Mr. or Mrs. Smith. Thus, the State quite properly concedes that the convictions under counts 8 and 9 must be merged into those under counts 13 and 14. *Newton v. State,* 280 Md. 260 (1977); *Brooks v. State,* 284 Md. 416 (1979); *Powell v. State,* 1 Md. App. 495 (1967). Accordingly, the convictions (and sentences imposed thereon) under counts 8 and 9 will be reversed.

### (2) Sufficiency of Evidence of Conspiracy to Receive Stolen Goods

Counts 5 and 6 of the indictment charged appellant and Williams with conspiring with each other and with other persons unknown to receive the goods taken from Mr. and Mrs. Smith, knowing the same to have been stolen. Appellant claims that the evidence was not sufficient to warrant his conviction on those counts.

To put this issue in a proper context, we start with the proposition that appellant could not have been convicted of both the robbery and the substantive crime of having received the goods taken in the robbery, for the same reason that precludes the conviction of both a larceny and receiving the goods stolen in the larceny: "in law a thief cannot be guilty of the crime of receiving stolen goods which he himself has stolen, and a guilty receiver of stolen goods cannot himself be the thief, and hence the defendant could not be guilty on both counts." *Heinze v. State,* 184 Md. 613, 617 (1945). *See also Bell v. State,* 220 Md. 75 (1959); *Hardesty v. State,* 223 Md. 559, 562 (1960); *Fletcher v. State,* 231 Md. 190 (1963); *Osborne v. State,* 4 Md. App. 57 (1968); *Hinton v. State,* 36 Md. App. 52 (1977).

This is not because of any doctrine of merger, but quite the opposite. The two crimes are deemed to be inconsistent.

The reason for this derives from the very nature of the crime of receiving. It arose initially from the common law misdemeanors of misprision of felony and compounding of felony (*see Jackson v. State,* 10 Md. App. 337 (1970)), and has carried forth at least two aspects of those antecedent offenses. One aspect is the sequential nature of the crime: it requires as a prerequisite a completed larceny. Until the larceny is complete, there are no stolen goods, known to be stolen and able to be received. Second, it has always envisioned the receiver as being someone other than the actual thief. This was evident from the root crimes: a person could not be convicted of misprision of felony or compounding a felony on the basis that he failed to prosecute himself for the underlying felony. The criminal act was the failure to prosecute someone else. Thus, as was said by the Florida court fifty years ago in *Bargesser v. State,* 116 So. 12 (Fla., 1928), "One cannot receive goods from himself. A theft must be perfected before the offense of receiving stolen property . . . can be perpetrated, and the receiver of the stolen goods must be a person other than the principal in the larceny." [1]

---

1. The rule prohibiting a conviction for both the larceny (or robbery) and receiving the goods stolen has always rested on the inconsistency between the two crimes, but there may be yet another basis to support it, a basis somewhat akin to double jeopardy and merger. Larceny and robbery are crimes against possession. They require, therefore, not only a taking but also a carrying away — an asportation in furtherance of an intention to deprive the owner of possession. *See* State v. Gover, 267 Md. 602 (1973). The larceny/robbery is not complete without the asportation, however slight that asportation may be. Osborne v. State, *supra,* 4 Md. App. 57; Wiggins v. State, 8 Md. App. 598 (1970).

The offense of receiving stolen goods has four elements: (1) the goods must be received; (2) they must, at the time of receipt, be stolen; (3) the receiver must have guilty knowledge that they are stolen; and (4) his intent in receiving them must be fraudulent. Jordan v. State, 219 Md. 36 (1959). Under the "required evidence" standard laid down in Newton v. State, *supra,* 280 Md. 260, the two crimes would not inherently merge because each requires one or more elements that the other does not.

If the law countenanced one's ability to receive stolen goods from himself, however, the act of asportation — that final element necessary to the crime of larceny/robbery — would necessarily constitute the reception of the goods — goods stolen, known to be stolen, and "received" with fraudulent intent. In other words, *every larceny or robbery would necessarily make the thief a receiver,* subject to double criminality and double punishment. The potential double jeopardy problem is self-evident. *See* North Carolina v. Pearce, 395 U. S. 711 (1969); Thomas v. State, 277 Md. 257 (1976); Cousins v. State, 277 Md. 383 (1976); Brooks v. State, *supra,* 284 Md. 416.

At least as early as 1822, however, the Court of Appeals recognized that a conspiracy to do any act that is itself criminal is an indictable offense at common law, quite apart from the substantive crime that is the object of the conspiracy. *See The State vs. Buchanan et al.,* 5 H.&J. 317, 351 (Dec. Term, 1821). A concise explanation of the relationship between the conspiracy and its criminal object, fully supported by the decisions of the Court of Appeals and of this Court, was given by the Supreme Court in *Iannelli v. United States,* 420 U. S. 770 (1975). At pages 777-78, the Court stated (with citations omitted):

> "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. . . . Unlike some crimes that arise in a single transaction . . . the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. . . . Thus, it is well recognized that in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end. . . . Indeed, the Court has even held that the conspiracy can be punished more harshly than the accomplishment of its purpose. . . .[2]
>
> "The consistent rationale of this long line of decisions rests on the very nature of the crime of conspiracy. This Court repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense."

*See,* in terms of the Maryland decisions, *Garland v. State,* 112 Md. 83 (1910); *Jones v. State,* 8 Md. App. 370 (1969).

Upon this rationale — that a conspiracy to commit any crime is itself a separate criminal offense — it would seem

2. *Compare,* however, Md. Annot. Code art. 27, § 38, limiting by statute the maximum punishment for conspiracy to that provided for the substantive offense.

clear that conspiracy to receive stolen goods is not only an independent indictable offense, but that, upon sufficient evidence, a person may be convicted of both the conspiracy and the substantive receiving offense. There are few, if any, appellate decisions addressing this particular question, but the result would seem to follow from the underlying general principles. *See United States v. Anderson,* 552 F. 2d 1296 (8th Cir. 1977) where, in a footnote on page 1300, the Court concluded, presumably in the context of 18 U.S.C. §§ 371 and 659, that "[c]onspiracy to receive and possess stolen goods and possession of those goods cannot be deemed 'inconsistent offenses' under any theory." Nor, based upon *Jones v. State, supra,* would two such convictions merge.

The question then is posed: assuming that conspiracy to receive stolen goods is a crime independent of the substantive offense of receiving such goods, under the circumstances of this case, may appellant be convicted of the conspiracy when, because the goods to be received were those actually stolen by appellant, he could not have been convicted of the substantive receiving offense? In other words, given the particular facts of this case, can a person be convicted of both the robbery of the goods and conspiracy to receive the same goods? If he cannot receive goods from himself, can he conspire to receive goods from himself?

We have carefully framed these questions around the facts in this case — where the conspiracy charged relates only to the goods taken in the robbery and appellant was an active participant in that robbery. We are not concerned with the situation in which the receiver or conspirator to receive is a mere aider or abettor in the robbery (*see Osborne v. State, supra,* 4 Md. App. 57 at 60; *State v. Bundy,* 372 P. 2d 329 (Ariz., 1962)), or with the case of a continuing conspiracy to receive stolen goods only part of which emanate from a larceny carried out by the conspirators (*compare People v. Lohman,* 6 C.A.3d 760, 767-68 (Cal., 1970), *cert. den.* 400 U. S. 995 (1971)), or where, although the evidence would indicate that the conspirator was an active participant in the larceny, he was not actually convicted of the theft (*see United States v. Anderson, supra,* 552 F. 2d at 1300; *Hinton v. State,* 36 Md. App. 52 (1977)).

Counts 5 and 6 of this indictment, read in conjunction with the robbery counts (13 and 14), charge appellant and Williams with conspiracy to receive the very goods that they alone stole from the Smiths — and only those goods. The evidence, and the inferences fairly deducible from it, may well suffice to establish a more general conspiracy to receive stolen goods — this coming from the fact that appellant and Williams had dealt with Beartrap on earlier occasions — but the convictions could rest only upon what was charged in the indictment; and that, as noted, concerned only what was taken in this one double robbery. Except to establish identity, therefore, or for some other collateral purpose, the other transactions between these co-defendants and Beartrap would be entirely irrelevant in terms of describing the particular conspiracy charged here.

The only evidence of the conspiracy charged in the indictment was the actual "fencing" of the goods by Williams within an hour or so after the robbery, the subsequent conversation between him and appellant, and the prompt return of the two to complain about the price paid. There was no evidence that the conspiracy antedated the robbery or that it was independently formed after the robbery. It established only the successful attempt to dispose, as quickly as possible, of the loot the two had just stolen.

In light of the limited scope of the charge and the evidence adduced to support it, the conspiracy convictions in this case suffer from what, in tennis terms, would be called a double fault.

We stated in *Jones v. State, supra,* 8 Md. App. at 379-80:

> ". . . . A conspiracy is *to accomplish* an act; the act is to be accomplished *in futuro;* the purpose of the conspiracy is *to do* something. 'Persons cannot be guilty of conspiracy to commit a crime which has already been committed.' 1 *Wharton, supra,* § 82, p. 176. 'Mere cognizance of the commission of a crime * * * does not make the person having such knowledge, a co-conspirator of the criminal.' *Id.,* § 84, p. 181. This does not mean that the consummation of a crime precludes prosecution for

a conspiracy to commit it. In fact the overt acts in the commission of the crime are relevant and material to the proof of the conspiracy. *Hill v. State, supra.* A criminal conspiracy is an offense distinct from the crime contemplated and the doctrine of merger is not applicable. *Id.,* § 87, p. 188; *Perkins, supra,* pp. 533-534. A prior conviction of a crime does not entitle the accused to the defense of *res judicata* in a subsequent prosecution for conspiracy, even though the same evidence was introduced as part of the proof of the conspiracy. *Rouse v. State,* 202 Md. 481. Nor does the acquittal of a particular crime bar a subsequent prosecution for a conspiracy to commit it. *Scarlett v. State, supra.* What it does mean is that there must be evidence, direct or circumstantial, or rational inferences therefrom, sufficient to show that the combination to commit the crime was formed prior to the commission of that crime. . . ." (Emphasis in original.)

The first fault, and a fatal one, is that there was simply no evidence sufficient to satisfy the criterion set forth in *Jones.* There was no evidence of the conspiracy to receive *these* goods other than that they were, in fact, received. The evidence was of the completed crime, not a conspiracy to commit it. Under the circumstances of this case, to establish the conspiracy by inference would be to inflate the crime of conspiracy well beyond any heretofore recognized bounds. It would permit the finding of a conspiracy upon a showing of nothing more than that two or more people committed a crime that involved the most minimal premeditation, planning, or escape from the scene. The State has given us no authority for such a conclusion, and we know of none.

The second fault is akin to the first. Appellant and Williams were not charged with conspiring to receive stolen goods from each other. The thrust of the indictment, and the evidence adduced to support it was a conspiracy, as a team, to receive such goods from themselves. In that context, it would be anomalous indeed if the law were to conclude that a person may not receive goods from himself, but that two

people may conspire among themselves to do so. Thus, at least where the only substantial evidence of the receiving conspiracy is that which establishes the completed crime, it is equally inconsistent to convict of both the robbery/larceny and the conspiracy as it is to convict of the robbery/larceny and the completed crime of receiving. The underlying inconsistency may perhaps be overlooked where the conspirators have not actually been convicted of the robbery/larceny, *à la United States v. Anderson, supra,* but it certainly may not be overlooked where such a conviction has been obtained. The two convictions are legally inconsistent and may not both stand.

As appellant in this case has specifically challenged the conspiracy convictions and not the robbery convictions, the judgments entered on the conspiracy counts will be reversed rather than those entered on the robbery counts. As the sentences imposed in both cases were the same (10 years), we perceive no prejudice to appellant from this approach. *Compare Bell v. State, supra,* 220 Md. 75; *Milanovich v. United States,* 365 U. S. 551 (1961).

### (3) Closing Argument

### (4) Remarks of the Prosecutor

We shall consider the remaining two issues together.

At the conclusion of the case, after the court had instructed the jury and the State's Attorney had made his initial closing argument, the following colloquy occurred:

> "MR. FLETCHER [defense counsel]: If the court please, Mr. Beard, the Defendant, has asked to address the jury in closing argument himself, and I ask the Court that he be allowed to do that.
> THE COURT: Is that your wish, Mr. Beard?
> THE DEFENDANT: Yes."

The court granted appellant's request and permitted him to address the jury directly.

Although it is evident from the verdicts that he failed to convince the jury of his innocence (or at least to plant that "reasonable doubt" in their minds), his argument was a forceful and articulate one. He started:

"Ladies and gentlemen of the jury, I will be brief in my summation. As to the balance which you decide, depending upon that, it rests with you how I convince you now of my participation or non-participation in this crime."

He referred to the State's "case in chief", and to the fact that it attempted to prove the crime in reverse sequence by starting with the fencing operation and moving back to the actual robbery. He argued:

"The fine line woven connecting me in this case from the end to the beginning is not there. It is a ghost. It is a charade in which they have taken technology, video tapes, tape recorders, professional people, the F.B.I., the State troopers in concert with the Baltimore City Police Department, and propped up the case superfluously just on the top. There is no depth. There is no density. Technology has connected me and Mr. Williams through audio video, as you saw on the tape, together, nothing else."

He proceeded then to examine and deprecate the evidence adduced against him, concluding, in the end:

"Ladies and gentlemen, I ask you to ask yourselves these questions because my life lies in the balance. Hopefully you will render a just and honest decision. I think you will. And I ask you to ask yourselves in your decision am I beyond a reasonable doubt guilty of this crime? Thank you."

In his rebuttal, the prosecutor attempted to use appellant's articulateness against him. Most of his argument addressed directly the points made by appellant, but, near the end, he said:

"Ladies and gentlemen, we have here obviously what I would refer to as a courtwise con man. He quotes: "The State's case in chief. How many of you ever heard that term, the State's case in chief? This man has heard it before. He is not only a criminal, admittedly having been in the House of Correction, but he is a courtwise con man who now has taken the position that he knows even more than his attorney, that he will defend himself."

No objection was made to these remarks; nor was a motion made to strike them, to admonish the prosecutor, or to instruct the jury further. But neither did the court say anything *sua sponte.*

Appellant first complains that his direct address to the jury amounted to a waiver of counsel, that the requirements of Maryland Rule 723 c were therefore applicable, and that the record indicates a failure to comply with those requirements. This is without any semblance of merit.

This was not a waiver of counsel. Counsel had represented appellant throughout the trial and continued to represent him during his address to the jury and afterward. Rule 723 is simply not applicable to this situation. The inquiry mandated by section c of that Rule applies to a defendant's initial appearance and "to any proceeding at which he appears *without counsel* thereafter." (Emphasis supplied.) *Thompson v. State,* 284 Md. 113, 126 (1978). At best, appellant's address may have approached what has become known as "hybrid representation", the allowance of which is discretionary with the court. *See Callahan v. State,* 30 Md. App. 628 (1976); *United States v. Hill,* 526 F. 2d 1019 (1975).

The complaint about the prosecutor's remarks is more serious, but, in the end, equally unavailing. His complaint, specifically, was to the remark about appellant's being "not only a criminal, admittedly having been in the House of Correction", and also to the comment that he was a "courtwise con man" who thought he knew more than his attorney.

Both of these comments were highly improper. They were not fair comment upon the substantive evidence in the case and were not directed at the impeachment of appellant's credibility as a witness. They were designed solely to instill in the jury a general antipathy toward appellant, and thus, in intent, exceeded the proper bounds of argument. *See Holbrook v. State,* 6 Md. App. 265 (1969); *Conway v. State,* 7 Md. App. 400 (1969); *Mouzone v. State,* 33 Md. App. 201 (1976).

The question before us, however, is whether it appears from the record that the jury was actually or likely to be influenced by these remarks to appellant's prejudice; for only in that circumstance would a reversal of the convictions be warranted. *See Holbrook, supra; Conway, supra.*

That appellant once resided in the Maryland House of Correction was brought out by *defense counsel* during his cross-examination of F.B.I. Agent Cherigo and of the victim, Charles Smith. Cherigo was asked, on cross-examination, "in your investigation of Mr. Beard were you aware that he was *an escapee* at the time from the Maryland House of Correction?" (Emphasis supplied.) When cross-examining Mr. Smith, counsel elicited the fact that Smith had once been imprisoned for possession of marijuana. He then asked:

"Q  Mr. Smith, is it correct to state the sentence you served was in the Maryland House of Correction?

A  Yes, it was.

Q  Was the Defendant Willie Beard also incarcerated at the Maryland House of Correction at that time?

A  I have no knowledge of that. If he was, I never seen him.

Q  Did you know Mr. Beard at all?

A  Never seen Mr. Beard. If it was him that morning and day, it was the first time.

Q  But you did not know Mr. Beard from the Maryland House of Correction?

A  No, I did not."

Appellant did not testify in his own defense, and so no evidence of any past criminal history was offered by the State for impeachment (or any other) purpose.

The prosecutor's remarks about appellant's having been a criminal, having been in the House of Correction, were improper because they were irrelevant to any issue in the case. But, given the fact that the jury was already aware of the same information, elicited by defense counsel, we cannot say that it was misled or prejudiced or likely to be misled or prejudiced, by the prosecutor's reminding it of what it already knew. To that extent, and in light of the quick passing reference in the context of the overall argument, the *Holbrook, Conway,* and *Mouzone* cases are distinguishable.

The remarks about appellant's being a courtwise con man, presuming to know more than his attorney, were also improper because of their irrelevance and their obviously inappropriate purpose. But they touched upon that which the jury could observe and judge for itself. These comments were not so inflammatory as, in our judgment, to create the real likelihood of prejudice.

> *Judgments entered on counts 5, 6, 8, and 9 reversed; judgments entered on counts 13 and 14 affirmed; costs to be paid by Baltimore County.*