993 A.2d 716

**Brandon T. MORRIS**

v.

**STATE of Maryland.**

**No. 2924, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

April 29, 2010.

2

4

**6**

Julia C. Schiller (Elizabeth L. Julian, Acting Public Defender, on the brief), Baltimore, MD, for Appellant.

James E. Williams (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Argued before MEREDITH, WRIGHT and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KENNEY, J.

On January 18, 2008, a jury sitting in the Circuit Court for Howard County found appellant, Brandon T. Morris, guilty of numerous offenses related to appellant's escape from Washington County Hospital and the death of Officer Jeffery Wroten, a correctional officer who had been guarding appellant at the hospital.[1]

---

1. Appellant was convicted of the following charges:

Appellant elected to be sentenced by the trial court, and, after proceedings on the prosecution's request that appellant be sentenced to death, appellant was sentenced as follows:

| | |
|---|---|
| First degree premeditated murder | Life without Parole |
| Robbery of Jeffrey Wroten | 15 years, consecutive |
| Escape in the first degree | 10 years, consecutive |
| Use of a handgun in the commission of a crime of violence | 20 years, consecutive |
| Disarming a correctional officer | 10 years, consecutive |
| Kidnapping Tina Bussard | 30 years, consecutive |
| Assault in the first degree of Tina Bussard | 25 years, consecutive |
| Attempted armed robbery of Tina Bussard | 20 years, consecutive |
| Use of a handgun in the commission of a crime of violence | 20 years, consecutive |
| Reckless endangerment of Shelly Bussard | 5 years, consecutive |
| Armed carjacking of Frank Fultz | 30 years, consecutive |
| Kidnapping of Frank Fultz | 30 years, consecutive |
| First degree assault of Frank Fultz | 25 years, consecutive |
| Armed robbery of Frank Fultz | 20 years, consecutive |
| Use of a handgun in the commission of a crime of violence | 20 years, consecutive |
| Fleeing and eluding by car and by foot | 6 months, consecutive |
| Illegal possession of a regulated firearm | 10 years, consecutive |
| Carrying a handgun | 5 years, consecutive |

He presents the following questions for our review:

1.) First degree premeditated murder of Jeffrey Wroten;

2.) Robbery of Jeffrey Wroten;

3.) First degree felony murder during the course of a robbery;

4.) Escape in the first degree;

5.) First degree felony murder during the course of an escape;

6.) Assault in the first degree of Jeffrey Wroten;

7.) Use of a handgun in the commission of a crime of violence against Jeffrey Wroten;

8.) Disarming a correctional officer;

9.) Kidnapping of Tina Bussard;

10.) Assault in the first degree of Tina Bussard;

11.) Attempted Armed Robbery of Tina Bussard;

12.) Use of a handgun in the commission of a crime of violence against Tina Bussard;

13.) Reckless Endangerment of Shelly Bussard;

14.) Armed Carjacking of Frank Fultz;

15.) Kidnapping of Frank Fultz;

16.) Armed Robbery of Frank Fultz;

17.) Assault in the first degree of Frank Fultz;

18.) Use of a handgun in the commission of a crime of violence against Frank Fultz;

19.) Fleeing and eluding by failure to stop a vehicle;

20.) Fleeing and eluding by fleeing on foot;

21.) Illegal possession of a regulated firearm; and

22.) Carrying a handgun.

1. Did the trial court err in denying [appellant's] Motion to Strike Death Penalty Notice because the Capital Punishment Execution Protocols have been struck down by the Maryland Courts, rendering the death penalty an illegal sentence?

2. Did the trial court err in allowing irrelevant and prejudicial testimony into evidence?

3. Was the evidence sufficient to sustain convictions for premeditated first degree murder, felony murder committed during the course of an escape, felony murder committed during the course of a robbery, and robbery?

4. Did the trial court err in the way escape was defined in the jury instructions?

5. Did the sentencing court err when it did not merge appellant's first-degree assault sentences into the corresponding sentences for robbery and attempted robbery with a dangerous weapon? [2]

With respect to the sentences imposed on appellant for the assault and robbery crimes committed against Tina Bussard and Frank Fultz, we conclude that the circuit court erred by failing to merge the first degree assault convictions into the corresponding armed robbery and attempted armed robbery convictions. We affirm the judgments in all other respects.

## FACTS AND PROCEEDINGS

On January 26, 2006, Officer Wroten was fatally shot at Washington County Hospital in Hagerstown while guarding appellant, an inmate of the Roxbury Correctional Institution ("RCI"). Officer Wroten was shot with the gun that had been issued to him for guard duty at the hospital. Less than an hour after Officer Wroten was shot, appellant was seen throwing that gun aside as law enforcement officers surrounded him in an open field near a trucking terminal. Because appellant has challenged the sufficiency of the evidence to support

---

**2.** We adapted question five from an argument heading in appellant's brief.

certain of the convictions, we will summarize, in some detail, pertinent facts introduced at appellant's trial.

On the afternoon of January 25, 2006, appellant complained of a wound that he would not allow the prison nurse to examine and was sent to the hospital with two armed escort guards. When an x-ray revealed that a sewing needle lodged under appellant's skin had punctured his liver, the emergency-room physician removed the needle and admitted appellant to the hospital for observation overnight. Appellant told the physician that he had been injured when someone bumped him that day, but, because it had healed over, the physician did not believe that the wound was new.

Upon learning that appellant would be admitted to the hospital for the night, RCI assigned Correctional Officer Glen Barnes to guard appellant at the hospital. Officer Wroten was assigned to relieve Officer Barnes at 11:00 p.m. Officer Barnes relieved the escort guards at the emergency room and waited with appellant for a private room for approximately three hours. While they waited, appellant, who was on a gurney, complained of nausea and asked to go to the bathroom five or six times. At about 9:30 p.m., the hospital assigned Room 5006 to appellant. Room 5006 had one bed and was located on the fifth floor, one room away from the nurses' station. An inmate from another correctional institution, who was also being guarded, had been admitted to an isolation room down the hall from Room 5006.

In accordance with RCI procedure, Officer Barnes was armed with one of the two 38–caliber revolvers which RCI stored in a vault at the hospital when not in use. RCI's protocols required officers to keep their revolvers in their holsters, which were equipped with thumb snaps.

Officer Barnes spent about two hours with appellant in Room 5006. During that time, appellant was in bed with one leg shackled to the bed. Appellant appeared drowsy but he remained awake and asked Officer Barnes when the shifts changed and who would guard him next. He also asked to go to the bathroom several times. To accommodate those re-

quests, Officer Barnes shackled appellant's legs together, unshackled appellant's leg from the bed, and accompanied him to the bathroom. On one occasion, appellant jumped up while Officer Barnes was re-shackling his leg to the bed. Officer Barnes was startled and told appellant to lie down. After initially refusing, appellant complied. When appellant asked to go to the bathroom at 10:30 p.m, Officer Barnes refused the request because the shift was about to change. Officer Wroten arrived at 10:45 p.m., and Officer Barnes told him that appellant felt nauseated and was going to the bathroom often.

When Denise Hudson, the registered nurse assigned to care for appellant, came in after midnight to administer antibiotics, she saw appellant returning to bed from the bathroom without shackles. She observed Officer Wroten re-shackle appellant's leg to the bed. At around that time, appellant complained that his bandage had come off, and Kristi Miller, also a registered nurse, came in to change it. At 2 a.m., Dorothy Reed, the nursing assistant assigned to appellant, entered Room 5006 to take appellant's vital signs. Officer Wroten was sitting in a chair with his gun holstered, and the television was on. Appellant appeared to be asleep, and, when she woke him, he sat up suddenly and startled her. He laid back down when Officer Wroten told him, "It is okay, Brandon."

At some point, Diane Reid, another nursing assistant, entered the room and reconnected appellant's IV tube, which had become disconnected from his arm and was leaking. At 2:30 a.m., Hudson returned because appellant's IV alarm had sounded. His tubing, which was attached by a lever, lock, and screw system, was again dislodged from his arm. She disconnected the machine and left the catheter in. At 3:30 a.m., Hudson noticed that appellant was awake and that the television was on. Also, during the evening, appellant yelled out to Rachael Yeagy, a registered nurse, that his bandage had come off, and she came in to change it. During the night, someone in the room called to Miller to pull the door further shut.

At around 5 a.m., Yeagy was across the hall in Room 5007 when she heard what sounded like the bed and a chain banging against the wall of Room 5006. At about the same

time, Melissa Sestak, a nursing supervisor, was in the room almost directly below Room 5007. She heard noises from above that sounded like fighting and furniture being moved around and ran upstairs. Meanwhile, Yeagy walked across the hall to listen further, but could not see anything because the door was closed. She heard heavy breathing and pushing and heard the guard say, repeatedly, "That is enough[.] [S]top that[.] [T]hat is enough." She called to the nurses' station that there was a fight and opened the door slowly because the noise was loud and she thought the people in the room were fighting near the door. When she looked into the room, Yeagy saw appellant crouching over Officer Wroten, who was "on the ground and [ ] leaning back on his right arm[.] [H]e looked up at [her,] just for a split second, and was back down, looking up to the inmate." Describing what she had seen, she stated:

The inmate was crouched over top of [Officer Wroten]. [Officer Wroten] kind of had, he had his left arm above head, trying to guard himself. . . . .

[T]he inmate had the gun in his right hand. He had the gun to the left side of his head. . . . To his temple. . . . .

Q. [PROSECUTOR]: To the guard's head?

A. Yes, yes, and he had—he crouched, was crouched down, and he was pushing, kind of had him pushed down with his right hand, was holding him down. He was crouched over top of him, and he—he did not yell it, but he said it in a very deep, like he was very angry, in a deep voice he stated—

Q. Who is he, . . . ?

A. The inmate stated to the guard. He got down, right in his face, and he said, "I am going to kill you, you motherfucker," and he shot him immediately.

Q. Was the guard saying anything before he got shot?

A. When he was laying on the ground, the only thing I could hear him saying was, ["P]lease don't[. P]lease don't.["]

When Yeagy saw appellant pull the trigger, she screamed that the guard had been shot and told the people who had been running towards her to run away.

Meanwhile, Miller, who was standing in the nurses' station, looked out when she heard noise from Room 5006. Miller saw Yeagy listening in the hallway, heard Yeagy call for help, and ran to Yeagy. Miller could hear Officer Wroten say something to the effect of "That's enough," or "Knock it off." Miller could see Officer Wroten's shoes through the partly-closed door. She could not see as much of the room as Yeagy saw, but she did not question that Yeagy saw what she described. Miller was uncertain of her own location when she heard the gunshot and did not know whether Yeagy had opened the door further after Miller started to run away. Reed believed that Yeagy had opened the door and entered the room far enough that Yeagy could not be seen from the nurses' station. The officer who was guarding the other prisoner on the floor heard Yeagy scream that Officer Wroten had been shot. After telephoning for help, that officer went to Room 5006 and saw Officer Wroten on the floor, being treated.

Tina Bussard, visiting her daughter Shelly Bussard, a patient in Room 5007, heard the noises from Room 5006 at the same time Yeagy heard them. When Yeagy left Room 5007 to investigate, Tina looked out into the hall, heard a popping noise, and saw Yeagy run into the hall saying that the guard had been shot. As Tina retreated into Room 5007, appellant entered the room, seized her from behind, waved the gun at her and Shelly, demanded her car keys and her pocketbook, and pulled Tina through the door, into the hall. Tina, still holding her pocketbook, jerked away, losing a clump of hair in the process.

Reed, who had come out into the hall upon hearing a gunshot, saw appellant, with a gun in his hand, holding Tina by the arm. After Tina broke free and ran back into Room 5007, where Shelly had remained, Reed saw appellant run out the double doors.

Security Officer Hutzell, who was outside on patrol in his car, saw a man in a hospital gown run out of the hospital and towards a taxicab. The taxi driver, Frank Fultz, was waiting

for a fare when a man jumped into his cab with a gun and said, "Drive, motherfucker[. Y]ou belong to me or I'll shoot ya." Appellant held the gun to Fultz's side, ordered him to drive to Pennsylvania, and demanded his money. Fultz handed appellant about fifty one-dollar bills and drove. Hutzell and his colleague followed and directed the police to the cab's location. When a police car attempted to pass the cab, appellant ordered Fultz to collide with the police car and then tried to grab the steering wheel. The cab hit a wall. Appellant was seen crawling out of the cab, holding a revolver. He fled into a field and eluded the police in the dark.

Appellant later appeared at a trucking terminal, clad only in boxer shorts, holding cash, claiming that he had been robbed, and asking terminal employees to call a taxicab. When police cars arrived, appellant ran. The police surrounded him and told him to drop the gun. He put the gun to his head, walked away, lowered the gun to his side, and kept walking. He then threw the gun to the ground and the cash in the air. The police arrested him.

Blood from two individuals was found on the gun. A forensic chemist concluded that the DNA profiles of those samples was thirty-five thousand times more likely to have originated from appellant and Officer Wroten than from other individuals within their respective populations. Other expert testimony connected the gun and appellant to the shooting in Room 5006.

The medical examiner who conducted the autopsy on Officer Wroten's body concluded that Office Wroten had died of a close-range gunshot wound to the head. He had also suffered blunt force injury to the side of his head, caused by one or more blows.

Appellant was indicted by a Washington County grand jury for thirty-six crimes, including the premeditated murder, felony murder, and robbery of Officer Wroten; escape; the kidnapping, assault, and armed robbery of Tina Bussard; the kidnapping, assault, and armed robbery of Fultz; car theft; numerous handgun offenses; and fleeing the police. The defense requested removal on the grounds of prejudicial pre-

trial publicity. After the prosecution served the defense with notice of its intention to seek the death penalty, the circuit court deemed the request for removal to be an exercise of appellant's automatic right to remove his death-penalty case under the Maryland Declaration of Rights and removed the case to the Circuit Court for Howard County. There, the defense moved to strike the death penalty as illegal. This Court dismissed appellant's interlocutory appeal of the denial of that motion. In the meantime, the trial scheduled for May 31, 2007, was postponed after appellant attempted to flee the courtroom during *voir dire*, and the trial judge recused himself.

Appellant's trial was finally set for January 2008. At a motions hearing shortly before trial, defense counsel stated three issues that appellant would contest at trial: first, "What exactly happened in [Room 5006] and was it a premeditated murder[;]" second, "Did [appellant] physically by force rob Officer Wroten of his gun prior to the shooting which would make it felony murder[;]" and third, "Did [appellant] seize the gun and shoot Officer Wroten for the purpose of escaping?"

The trial court conducted *voir dire* over three days. The defense indicated that it was satisfied with the jury and alternates.

After the jury found appellant guilty of first-degree murder and multiple other crimes, he elected to be sentenced by the court. The court sentenced him to serve life without parole for the murder of Officer Wroten and numerous other periods of incarceration, as stated above.

We shall recite additional facts as the need arises.

## DISCUSSION

### I.

**Whether the circuit court erred in denying appellant's request to strike the prosecution's notice of its intention to seek the death penalty.**

Appellant contends that the motions court committed reversible error by denying his motion to strike the prosecu-

tion's notice of its intent to seek the death penalty. According to appellant, the death penalty is now an "illegal sentence" because the Court of Appeals, in *Evans v. State*, 396 Md. 256, 914 A.2d 25 (2006), *cert. denied sub nom, Grandison v. Maryland*, 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985), struck down Maryland's regulations on execution protocols. Relying on cases in which courts have ordered the dismissal of indictments for crimes for which the legislature has provided no penalty, appellant argues that the invalidity of the execution protocols removed the death penalty as a penalty that could be imposed on appellant and precluded capital proceedings in his case. Even though he was not sentenced to death, appellant contends, generally, that he was prejudiced because his trial strategy was affected by the possibility of a death sentence. Additionally, citing studies for the proposition that jurors selected for capital cases "are more likely to convict than non-death qualifiers," appellant argues that he was prejudiced by the selection of a jury which had undergone *voir dire* for a death-penalty proceeding.

The State contends that the issue is moot because appellant was not sentenced to death. The State adds that the appellant waived any argument that the jury was tainted by the *voir dire* because appellant did not raise that argument at trial. The State alternatively argues that the *Evans* Court did not declare the death penalty to be an illegal sentence, but, instead, held that the penalty could only be administered under properly-promulgated regulations.

We begin by addressing whether the fact that appellant was not sentenced to death rendered moot his argument that the trial court erred by denying his motion to strike the prosecution's death-penalty notice. An issue is moot when "[t]here is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Armstrong v. Mayor of Baltimore*, 409 Md. 648, 674, 976 A.2d 349 (2009) (citations and quotation marks omitted). As a general rule, when an appellant establishes that the trial court committed a legal error

that was both prejudicial and preserved, we have the power to grant a remedy, such as a new trial. *See* Md. Rule 8–604; *see also, e.g., Lewis v. State,* 285 Md. 705, 714, 404 A.2d 1073 (1979) (remanding case for new trial on lesser and greater counts, although claimed error pertained only to the greater counts, because of possibility of merger). Accordingly, were we to agree with appellant that the prosecution filed an illegal death-penalty notice which prejudiced his defense in the guilt phase of the trial, we could remedy the error in the denial of appellant's motion to strike that notice. In short, the mootness doctrine would not apply. As we shall explain, however, appellant faces other hurdles.

Appellant challenges the legality of the death penalty "post-*Evans.*" In *Evans,* the appellant requested that the Department of Corrections be enjoined from executing him under its protocols for administering lethal injections. 396 Md. at 271, 914 A.2d 25.

Maryland Code (1957, 1999 Repl.Vol.) Title 3, subtitle 9 of the Correctional Services Article ("Corr.Serv.") sets forth the procedures for executing a sentence of death. Corr. Serv. § 3–905(a) provides:

> The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice.

Corr. Serv. § 3–906, **Administration of Lethal Injection,** provides:

> (a) *Duties of Commissioner.*—The Commissioner shall:

> (1) provide a suitable and efficient place, enclosed from public view, in which an execution may be carried out;

> (2) provide all of the materials that are necessary to perform the execution; and

> (3) subject to subsection (c) of this section, select the individuals to perform the execution.

(b) *Supervision.*—The Commissioner or the Commissioner's designee shall supervise the execution.

(c) *Lethal injection.*—

(1) An execution shall be performed by individuals who are selected by the Commissioner and trained to administer the lethal injection.

(2) An individual who administers the paralytic agent and lethal injection need not be licensed or certified as any type of health care practitioner under the Health Occupations Article.

These provisions were enacted by the General Assembly in 1994. *Evans,* 396 Md. at 337, 914 A.2d 25 (citing 1994 Md. Laws, ch. 5). "After enactment of Ch. 5, the [Department of Corrections ("DOC") ] adopted an Execution Operations Manual (EOM) to govern virtually all aspects of implementing the death sentence by lethal injection." *Id.*

Maryland Code (1984, 2009 Repl.Vol.), Title 10, subtitle 1 of the State Government Article ("State Gov't"), which is part of the Administrative Procedure Act ("APA"), sets forth certain requirements for the adoption of regulations by executive agencies subject to the statute, including the DOC. *Id.* at 344, 914 A.2d 25 (citing *Massey v. Dept. of Corrections,* 389 Md. 496, 499, 886 A.2d 585 (2005)). The statute provides that a regulation that is subject to the statute can be adopted only if it is in compliance with State Gov't § § 10–110 and 10–111. *Id.* at 344–45, 914 A.2d 25. The *Evans* Court held that "[n]one of the procedures mandated by those statutes were followed by DOC prior to adopting or, from time to time, amending the EOM." *Id.* at 345, 914 A.2d 25. The Court stated:

[W]e hold that those aspects of the EOM that direct the manner of executing the death sentence—the Lethal Injection Checklist-constitute regulations under SG § 10–101(g) and, because they were not adopted in conformance with the

18

requirements of the APA, are ineffective and may not be used until such time as they are properly adopted.

*Id.* at 350, 914 A.2d 25.

The Mandate provided:

> ... IN NO. 122, ... CASE REMANDED TO [THE CIRCUIT] COURT WITH INSTRUCTIONS TO ENJOIN ENFORCEMENT OF LETHAL INJECTION CHECKLIST INCLUDED AS PART OF DIVISION OF CORRECTION EXECUTION OPERATIONS MANUAL UNTIL SUCH TIME AS THE CONTENTS OF THAT CHECKLIST, IN THEIR CURRENT OR ANY AMENDED FORM, ARE ADOPTED AS REGULATIONS IN ACCORDANCE WITH THE REQUIREMENTS OF THE ADMINISTRATIVE PROCEDURE ACT OR THE GENERAL ASSEMBLY EXEMPTS THE CHECKLIST FROM THE REQUIREMENTS OF THAT ACT. ...

*Id.*

Appellant argues that the Court of Appeals' holding in *Evans* "created a void" and that "a void in the regulations—missing details—means that there is no properly enacted death penalty." To support his contention, appellant cites *Sec'y, Dep't of Pub. Safety & Correctional Servs. v. Demby,* 390 Md. 580, 890 A.2d 310 (2006). In *Demby,* the Court of Appeals explained how the *ex post facto* clause applied to the adoption of administrative regulations adopted by the Department of Public Safety and Correctional Services ("DPSCS"). At issue were amendments to the Code of Maryland Regulations, concerning special housing credits. The Court quoted *United States v. Ellen,* 961 F.2d 462, 465 (4th Cir.1992), *cert. denied,* 506 U.S. 875, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992), where the United States Court of Appeals for the Fourth Circuit stated:

> When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the result-

ing administrative rule is an extension of the statute for purposes of the [*ex post facto*] clause.

The *Demby* Court stated:

> Our next determination must focus on whether this regulation is legislative or merely interpretive in nature. We find that the amendments in the instant case are not merely guides that may be discarded where circumstances require. The amendments here are substantive, pursuant to properly delegated authority in Md.Code (1999), § 2109(c) of the Correctional Services Article, and have the force of law as they effectively create a new law governing who shall receive special project credits.

390 Md. at 607–08, 890 A.2d 310.

> Based on *Demby*, appellant argues:

> The regulations adopted by the Department of Public Safety and Correctional Services that direct the manner of implementing the death penalty would be "substantive, pursuant to properly delegated authority ... and have the force of law as they effectively create a new law governing how to carry out capital punishment."

We do not read the Court's holding in *Demby* so broadly. Though the regulations created in the EOM by the DOC have been deemed substantive, *Evans,* 396 Md. at 345, 914 A.2d 25, they do not "create a new law governing how to carry out capital punishment." Instead, they provide specific directions to implement the law created by the legislature in some detail. The procedures the DOC established to be followed when carrying out a lethal injection, though subject to the APA, do not rise to the level of "new laws," such that a gap in their effectiveness would result in an invalidation of the death penalty.

Appellant also cites *McCurdy v. State,* 151 Md. 438, 135 A. 161 (1926), where the defendant was convicted of "manufacturing for sale intoxicating liquors in Washington County." *Id.* at 442, 135 A. 161. In that case, the Court of Appeals stated: "If an indictment contains allegations which constitute an offense, for which no penalty is provided by the statute or common

law, the proper method of raising the question relied upon is by demurrer. . . ." *Id.* Therefore, appellant argues, the Court of Appeals "recognized that where a statute has no penalty provision, that statute is subject to challenge, if raised properly."

We view *McCurdy* as inapplicable, for, in this case, the statute under which appellant was convicted has a penalty provision. Maryland Code (1957, 2009 Repl.Vol.) § 2–201 of the Criminal Law Article ("Crim.Law") provides, in relevant part:

(b) *Penalty.*—

(1) A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:

(i) death;

(ii) imprisonment for life without the possibility of parole; or

(iii) imprisonment for life.

Furthermore, Corr. Servs. § 3–905(a) explains, in some detail, the manner of carrying out a sentence of death as approved by the legislature.

The mandate in *Evans* clearly indicates that the Court did not reverse Evan's death sentence. The Court simply remanded the case to the circuit court to enjoin enforcement of the lethal injection checklist until such time as the contents of the checklist were adopted as regulations in accordance with the APA or until the General Assembly exempts the check list from the APA. It follows, then, that the Court did not view enjoining the current Lethal Injection Checklist as invalidating the death penalty.

Appellant argues that, after *Evans*, "the Circuit Court would have been unable to render a legal death sentence, had the penalty been imposed. The Circuit Court could not have issued a warrant of execution that commanded the Commissioner of Corrections to perform an unauthorized execution."

The State responds:

The Maryland Legislature provide[s] the statutory authority for the Circuit Court to issue a warrant of execution pursuant to Section 3–902 of the Correctional Services Article. That statute also provides that: "A warrant of execution is stayed during the direct review process and the State postconviction review process." Consequently, even if the Circuit Court issued an execution warrant had Morris actually received the death penalty, any such warrant would be stayed pending automatic direct appeal to the Court of Appeals, and post conviction proceedings, if any.

We agree with the State that the statutory authority provided to the circuit court to issue a warrant of execution pursuant to Corr. Serv. § 3–902 was not invalidated by the Court in *Evans*. Once the procedures outlined in the Lethal Injection Checklist are adopted as regulations under the APA, the warrant of execution could be carried out.

Moreover, the Court of Appeals addressed the constitutionality of the death penalty statute after *Evans* in *State v. Borchardt*, 396 Md. 586, 914 A.2d 1126 (2007). Under the principle of constitutional avoidance, constitutional issues are not reached needlessly. *See In re Julianna B.*, 407 Md. 657, 667–668, 967 A.2d 776 (2009) (" '[T]his Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground.' " (citation omitted)). Had the Court invalidated the death penalty in *Evans*, it would have had no reason to reach the constitutional issue in *Borchardt*.

In 2009, the General Assembly declined to repeal the death penalty. Instead, it amended Crim. Law § 2–202(a) and (c) to condition the imposition of the penalty on the admission of specific types of evidence.[3]

---

3. Crim. Law § 2–202(a) and (c), as amended, provide:
 (a) *Requirement for imposition.*—A defendant found guilty of murder in the first degree may be sentenced to death only if:
 (1) at least 30 days before trial, the State gave written notice to the defendant of:
 (i) the State's intention to seek a sentence of death; and

We are persuaded that the Court's holding in *Evans*, that the Lethal Injection Checklist was "ineffective," did not act to preclude the State from seeking or the court from imposing the penalty of death. As the death penalty statute was not illegal at the time appellant received notice that the State would seek the death penalty, we hold that the trial court did not err by denying appellant's motion to strike the death penalty notice based on appellant's assertion that the death penalty was illegal.

Because we have held that the death penalty has not been invalidated by *Evans*, we need not address in any detail appellant's argument that the notice of the State's intention to seek the death penalty prejudiced him. He contends that a "death-qualified" jury is more likely to convict, and, second, that his trial strategy was based on the possibility of a death

---

(ii) each aggravating circumstance on which the State intends to rely;

(2) (i) with respect to § 2–303(g) of this title, except for § 2–303(g)(1)(i) and (vii) of this title, the defendant was a principal in the first degree; or

(ii) with respect to § 2–303(g)(1)(i) of this title, a law enforcement officer, as defined in § 2–303(a) of this title, was murdered and the defendant was:

1. a principal in the first degree; or

2. a principal in the second degree who:

A. willfully, deliberately, and with premeditation intended the death of the law enforcement officer;

B. was a major participant in the murder; and

C. was actually present at the time and place of the murder;

(3) the State presents the court or jury with:

(i) biological evidence or DNA evidence that links the defendant to the act of murder;

(ii) a video taped, voluntary interrogation and confession of the defendant to the murder; or

(iii) a video recording that conclusively links the defendant to the murder; and

(4) the sentence of death is imposed in accordance with § 2–303 of this title.

\* \* \*

(c) *Limitations.*—State relies solely on eyewitness evidence.—A defendant may not be sentenced to death, but shall be sentenced to imprisonment for life without the possibility of parole subject to the requirements of § 2–203(1) of this subtitle or imprisonment for life, if the State relies solely on evidence provided by eyewitnesses.

sentence and would have differed in the absence of that possibility.

The Court of Appeals has twice rejected the argument that seating a "death-qualified" jury denies a defendant the Constitutional right to an impartial jury at the guilt or innocence stage of the trial. *Grandison v. State*, 305 Md. 685, 727, 506 A.2d 580, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); *Foster v. State*, 304 Md. 439, 466, 499 A.2d 1236 (1985), *cert. denied sub nom, Maryland v. Foster*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984). Although appellant claims that the defense strategy was prejudicially affected by the possibility of a death sentence, he has not identified how the defense strategy would have shifted in any way were that not the case, nor is it apparent from the record.

## II.

### Whether the circuit court abused its discretion with regard to the admission of Ms. Wroten's testimony.

Appellant contends that the trial court abused its discretion by permitting Officer Wroten's former wife, Tracy Wroten, to identify an autopsy photograph of him and to testify about his activities with their children before he went to guard appellant on the night of January 25. Appellant argues that Ms. Wroten's testimony was not probative of any fact in issue and was unduly prejudicial. The State responds that Officer Wroten's activities that evening were relevant to show how he came into contact with appellant and that the autopsy photograph was admitted later without objection.

Shortly before the prosecution called Ms. Wroten as its first witness, defense counsel requested a bench conference so that in-chambers discussions about her testimony could be put on the record. The following ensued:

[DEFENSE COUNSEL]: Your Honor, in chambers we discussed the testimony of the first witness, the ex-wife of Officer Wroten, Tracy Wroten. And, after hearing what the

**24**

State proposes to elicit from her, there was a single objection.

As we understand it, the State will show Ms. Wroten a copy of a photograph, Officer Wroten with a bullet hole. It was a photograph, as I understand it, that was taken at the autopsy.

Objection to that is that the witness—there is no dispute as to the autopsy was conducted upon [sic], who that photograph depicts, and, therefore, our position was the testimony of Ms. Wroten was not necessary under 5–403. We think there is a potential prejudice in her identifying her ex-husband, and that the prejudice would outweigh any probative value it has. That was our position.

THE COURT: All right.

PROSECUTOR: Your Honor, the State has shown the photograph it will show the witness to the defense. It is one of the black and white photographs of the decedent's face. That is part of the State's Exhibit that will be—we will seek admission, or at least will be referred to by Doctor Ali this afternoon. And, she will simply identify this as her ex-husband. They divorced in the summer of 2006.

\* \* \*

THE COURT: Okay, all right, I am going to overrule the defense's objection. There is, I think, a balancing test, but the picture has been agreed to, and I think it important that it be identified, and I do not have a problem with letting her testify.

\* \* \*

The State then called Ms. Wroten to the stand. She testified without objection to the ages of the four children she and Officer Wroten had together and then to the date of their marriage. Responding to the prosecutor's questions, she then testified as follows:

Q. Did you see Jeffery frequently after your marriage ended?

A. Every day, every day.

Q. And, did you see him on January 25, 2006?

A. Yes, I did.

Q. Where did you see him?

A. He came to my office for the afternoon to talk about parenting things, plans for the kids, financial things that parents need to talk about. Putting the girls in little league for the first time.

Q. Well, did you see him after he was at your office?

A. Yes, he—

Q. Where—where did you see him?

A. He picked up the girls off the bus, took them to my house to watch them and fix them supper while I worked.

Q. What did Jeffery do for a living?

A. He was a Correctional officer.

Q. And, was he working that day, January 25?

A. He had gotten off work at eight o'clock.

Q. So, you saw him at your office, and you—did you see him at your house then?

A. Yes, he was there when I got home from work.

Q. What was happening when you got home?

A. He and the girls were disco dancing in the kitchen.

Q. And, did you speak with him after that?

A. Sure, sure we laughed about dancing and rocking the refrigerator, and put the girls to bed, and he stayed and talked to me later. And, he left and called me about an hour later, and said he had been called in for—grab an overtime shift.

Q. Was he supposed to work that night?

A. No, it was his night off.

Q. Would you mark this.

(Picture was marked for identification as State's Exhibit No. 1)

Q. I am showing you what has been marked as State's Exhibit No. 1, do you recognize this?

A. Yes.

Q. And, what is that a photograph of?

A. A picture of Jeff.

Q. Does that fairly, accurately represent what he looked like around the last time that you saw him?

A. Yes, I took the picture.

Q. Could you tell me a little bit about Jeff's height, how tall he was?

A. Six feet tall.

Q. About how much he weighed, if you know?

A. About four thirty.

Q. Big man.

A. Big man.

Q. After he spoke to you that night, did you see—when was the next time that you saw Jeff?

A. Lying in a hospital room.

Q. And, when did you see him?

A. It was the next morning, they called to tell me he had been hurt.

Q. Okay, I am showing you what has been marked as State's Exhibit No. 2. Do you recognize this person?

(Photograph was marked for evidence as State's Exhibit No.2.)

A. Um-hmm.

Q. And, who is that?

A. It is Jeff.

Q. Does that represent fairly, and accurately what he looked like when you saw him in the hospital?

A. Um, yes.

Q. Did there come a time when Jeff passed away?

A. Yes.

Q. When was that?

A. They pronounced him the next day.

Q. The next day, after—you went in the morning, so the twenty-seventh?

A. Um-hmm.

Q. State would move admission of State's Exhibit No. 1 and 2.

[DEFENSE COUNSEL]: No objection.

THE COURT: All right.

(Photos admitted into evidence as State's
Exhibit Nos. 1 and 2.)

[PROSECUTOR]: And, offer the witness for cross examination.

[DEFENSE COUNSEL]: No questions.

State's Exhibit 1 is a photograph of Officer Wroten alive; Exhibit 2 is a black-and-white 8 inch by 10 inch autopsy photograph of Officer Wroten's head and upper neck. Exhibit 2 shows a discrete wound to the officer's upper cheek, near his temple. That photograph is also included in the autopsy photographs later admitted without objection as State's Exhibit 16.

Generally, evidence is admissible when: 1) it is relevant, and 2) "its probative value is [not] substantially outweighed by the danger" that the evidence will prejudice a party, confuse the issues, or mislead the jury. *Smith v. State,* 371 Md. 496, 504, 810 A.2d 449 (2002) (citing Rules 5–402 and 5–403). Evidence is relevant if it "tend[s] to establish or refute a fact at issue in the case." *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997) (citing Rule 5–401).

Decisions regarding the admission of relevant evidence are "committed to the sound discretion of the trial court." *Thomas v. State,* 397 Md. 557, 579, 919 A.2d 49 (2007). Accordingly, we do not reverse those decisions "unless there is a clear abuse of discretion." *Id.* (citing *Kelly v. State,* 392 Md. 511, 530, 898 A.2d 419 (2006); *Merzbacher,* 346 Md. at 404–05, 697 A.2d 432). Nor do we reverse evidentiary decisions when, "upon [our] independent review of the record," we are "able to

declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict...." *Taylor v. State*, 407 Md. 137, 165, 963 A.2d 197 (2009) (citations and quotations omitted).

■ Addressing Ms. Wroten's testimony concerning the autopsy photograph, the circuit court acknowledged, and, presumably, conducted, a "balancing test" between the need for identification of the photograph for purposes of establishing an evidentiary foundation and any unfair prejudice created by the testimony of an emotional witness. The judge concluded that it was "important that [the autopsy photograph] be identified"[4] and did not "have a problem with letting [Ms. Wroten] testify." Having found a need for the testimony, the circuit court did not abuse its discretion by allowing Ms. Wroten to testify.

■ As to Ms. Wroten's testimony concerning the activities of Officer Wroten before he arrived at the hospital, appellant did not specifically object to this testimony. As appellant objected to having Ms. Wroten testify generally concerning Officer Wroten's death, we shall assume, without deciding, that the issue of letting Ms. Wroten testify as to the victim's identity and activities prior to the hospital has been adequately preserved for our review.

Appellant argues:

Nothing about the testimony of Tracey [sic] Wroten had any rational relationship to the issue of whether Mr. Morris was, in fact, the individual who took the life of Officer Wroten. The testimony of Ms. Wroten provided background information about Officer Wroten and what Officer Wroten did before he arrived at Washington County Hospi-

---

4. In *State v. Broberg*, 342 Md. 544, 561, 677 A.2d 602 (1996), the Court of Appeals stated that the prosecution may prove the victim's identity through photographs "taken after death" as well as photographs taken "in life." The prosecution must also establish the authenticity of the photographs, either through the photographer or through someone with personal knowledge who can verify that the photograph accurately portrays its subject. *Id.* at 553, n. 5, 677 A.2d 602.

tal. This information was utterly irrelevant to the jury. The testimony had "no natural tendency" to prove any fact in issue, nor was it probative of the proposition in issue; rather it was more likely to "divert the minds of the jur[ors] from the real point in issue, and may arouse their prejudices." . . . .

We are not persuaded. Ms. Wroten's testimony concerning the prior activities of Officer Wroten before he arrived at the hospital established that Officer Wroten was alive prior to his shift at the hospital. This evidence was generally relevant to the identification of the autopsy photograph and establishing the identity of the victim. We are persuaded that the court acted within its discretion by letting in the testimony of Ms. Wroten. Moreover, we are persuaded that, in light of the State's evidence in this case, the admission of Ms. Wroten's testimony would be harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

Appellant also argues that he was unduly prejudiced by Ms. Wroten's testimony because she "[broke] down crying on the stand" during her testimony. Though not specifically objected to, we will address the issue.

The transcript neither supports nor contradicts appellant's assertion that Ms. Wroten cried during her testimony. In *Hunt v. State*, 312 Md. 494, 501, 540 A.2d 1125 (1988), in addressing the defendant's claims that he was prejudiced by the victims' relatives' displays of emotion, the Court of Appeals stated: "Without the incident in the record, we cannot speculate as to what transpired. . . ."

Yet, even if Ms. Wroten did cry during her testimony, some display of emotion does not necessitate the exclusion of her testimony. In *Clarke v. State*, 238 Md. 11, 207 A.2d 456 (1965), the defendant claimed that the court's admittance of the testimony of the murder victim's mother, during which the mother cried, created undue prejudice and an unfair trial. The Court of Appeals, in addressing the defendant's complaint, stated: "It is true that the witness cried upon the stand, but the trial judge cannot, at times, control the emo-

tions of witnesses, and every emotional outburst of a witness does not entitle an accused to a mistrial." *Id.* at 22, 207 A.2d 456; *see also Hunt,* 312 Md. at 501, 540 A.2d 1125 ("Emotional responses in a courtroom are not unusual, especially in criminal cases, and manifestly the defendant is not entitled to a mistrial every time someone becomes upset. . . .").

### III

### Whether the court erred in denying appellant's motions for acquittal.

Appellant challenges the sufficiency of the evidence with respect to premeditated murder, felony murder based on escape, robbery, and felony murder based on robbery. With respect to the premeditated murder and robbery convictions, appellant argues that the prosecution did not introduce direct evidence of what occurred in Room 5006. With respect to escape and robbery, appellant argues that the prosecution's evidence varied from the crimes charged in the presentment. We shall begin with the issues regarding the sufficiency of the evidence and then turn to the issues regarding the alleged variance between the presentment and the prosecution's proof.

*A. The sufficiency of the evidence of first-degree premeditated murder and of robbery.*

 In reviewing a challenge to the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the prosecution in order to determine whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (other citations omitted)) (emphasis in original). We defer to the fact-finder's decisions on which evidence to accept and which inferences to draw when the evidence supports differing inferences. *State v. Suddith,* 379 Md. 425, 430–31, 842 A.2d 716 (2004). In other words, we " 'give deference to all reasonable inferences [that] the fact-

finder draws, regardless of whether ... [we] would have chosen a different reasonable inference.'" *Burlas v. State*, 185 Md.App. 559, 568, 971 A.2d 937 (quoting *Suddith*, 379 Md. at 430, 842 A.2d 716), *cert. denied*, 410 Md. 166, 978 A.2d 245 (2009). In our independent review of the evidence, we do not distinguish between circumstantial and direct evidence because "[a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence." *Burlas*, 185 Md.App. at 569, 971 A.2d 937.

 We turn first to appellant's argument that the evidence of first-degree premeditated murder was insufficient. He argues that Yeagy's testimony was contradicted by Miller and, therefore, the prosecution introduced no direct evidence of what occurred before the shot was fired in Room 5006. The State argues that Yeagy's testimony was itself sufficient to convict appellant of first degree premeditated murder, and, also, that Miller did not contradict Yeagy's testimony.

 "Murder in the first degree," as defined in Crim. Law § 2–201(a)(1),[5] includes "a deliberate, premeditated, and willful killing...." *Id.* To prove premeditated first-degree murder, the State must adduce evidence "that the defendant possess[ed] the intent to kill (willful), that the defendant ha[d] conscious knowledge of that intent (deliberate), and that there [was] time enough for the defendant to deliberate, *i.e.*, time enough to have thought about that intent (premeditate)." *Willey v. State*, 328 Md. 126, 133, 613 A.2d 956 (1992).

---

5. Crim. Law § 2–201 provides, in pertinent part:
 (a) *In general.*—A murder is in the first degree if it is:
 (1) a deliberate, premeditated, and willful killing;
 (2) committed by lying in wait;
 (3) committed by poison; or
 (4) committed in the perpetration of or an attempt to perpetrate [any of twelve enumerated felonies, including]: ...
 (v) escape in the first degree from a State correctional facility or a local correctional facility;
 ...
 (ix) robbery under § 3–402 or § 3–403 of this article;....

Here, the prosecution introduced Yeagy's testimony that appellant held a revolver to Officer Wroten's temple before pulling the trigger, in addition to photographic and medical evidence that Officer Wroten was killed by a bullet wound to the upper cheek, near his temple. From this evidence, the jury could reasonably find that appellant used a deadly weapon directed at a vital part of Officer Wroten's body and reasonably infer the requisite willfulness.

The Court of Appeals summarized the "deliberate" and "premeditated" requirements in *Mitchell v. State*, 363 Md. 130, 148–49, 767 A.2d 844 (2001):

> For murder "to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate." *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980). We added in *Tichnell*, however, that "[i]t is unnecessary that the deliberation or premeditation shall have existed for any particular length of time." *Id.* at 717–18, 415 A.2d at 842. "Appreciable length of time" simply means "any amount of time sufficient to convince the trier of fact that the purpose to kill was not 'the immediate offspring of rashness and impetuous temper,' but was he product of a mind 'fully conscious of its own design.'" *Willey v. State*, 328 Md. 126, 133, 613 A.2d 956, 959 (1992)[.]
> ... [W]e confirmed in *Willey* that "[i]f the killing results from a *choice made as the result of thought, however short the struggle between the intention and the act*, it is sufficient to characterize the crime as deliberate and premeditated murder." *Willey, supra*, 328 Md. at 133, 613 A.2d 956 [(emphasis in original).]

The time needed to establish deliberation can be brief. For instance, in *Hunt v. State*, the Court held that the time it took the defendant to prepare his weapon to fire a second time was "enough time for reflection and decision to justify a finding of premeditation." 345 Md. 122, 161, 691 A.2d 1255, *cert. denied*, 521 U.S. 1131, 117 S.Ct. 2536, 138 L.Ed.2d 1036 (1997). The Court listed the "deliberate and conscious actions" taken by

that defendant to make his gun operational: "He pulled the hammer of the weapon toward him. He pointed the weapon at [the victim], and he pulled the trigger." *Id.* The Court rejected the notion that the weapon in question, a single-action revolver, could be "fired in any other but a deliberate manner." *Id.* In *Colvin v. State*, 299 Md. 88, 108–09, 472 A.2d 953, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), the Court of Appeals held that the time in which it took a burglar to take a knife from the kitchen to the stairway where he attacked the victim to be sufficient to establish deliberation. *Id.* at 108–09, 472 A.2d 953.

In this case, Yeagy testified that, while struggling with Officer Wroten and before shooting him, appellant held Officer Wroten down with one hand, held a revolver to the officer's temple with the other hand, and told him, "I'm going to kill you, you motherfucker." According to her testimony, Officer Wroten looked at her and away from her and said, "Please don't," before appellant pulled the trigger. Yeagy's testimony supports an inference that appellant had sufficient time in which to deliberate the shooting.

The jury was entitled to credit Yeagy's testimony and to reject an alternative inference based on Miller's testimony that Yeagy could only have seen the officer's shoes from her vantage point. *See Suddith*, 379 Md. at 430, 842 A.2d 716 (the fact-finder may choose among differing inferences). Therefore, we are persuaded that the prosecution introduced sufficient evidence to sustain the jury's verdict for first-degree premeditated murder.

 We turn next to appellant's argument that the evidence presented was insufficient to support a conviction of felony murder based on the robbery of the weapon from Officer Wroten. Robbery is "a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)." *Snowden v. State*, 321 Md. 612, 618, 583 A.2d 1056 (1991). The prosecution introduced testimony from which the jury could infer that the revolver used by appellant was the revolver seen in Officer Wroten's holster, in addition

to evidence of a struggle over the weapon. The jury could reasonably infer from the evidence that appellant took the revolver from the person of Officer Wroten by violence.

To establish felony murder, the prosecution was required to prove that the murder was "committed in the perpetration of or an attempt to perpetrate ... robbery under [Crim. Law] § 3–402 or § 3–403...." Crim. Law § 2–201(a)(ix). As codified at Crim. Law § 2–201, "the intent to commit the underlying felony must exist prior to or concurrent with the performance of the act causing the death of the victim." *State v. Allen*, 387 Md. 389, 402, 875 A.2d 724 (2005). Accordingly, an "afterthought felony will not suffice as a predicate for felony-murder." *Id.* Here, the jury could reasonably infer from the fight and ongoing struggle, that appellant took the weapon from Officer Wroten and shot him in the course of doing so. The evidence was sufficient to sustain appellant's conviction for felony-murder committed during the crime of a robbery.

B. *The sufficiency of the presentment to charge the predicate robbery and escape crimes of which appellant was convicted.*

As part of his sufficiency argument, appellant asserts that the prosecution's evidence varied from the felony murder/robbery and the felony murder/escape crimes charged in the presentment.

As to robbery, he argues that the presentment charged a robbery "as defined in Crim. Law § 3–402," and that § 3–402 does not contain a definition of that crime. Count Three lists Crim. Law § 2–201(a)(4)(ix) as its basis and states that appellant "... feloniously, willfully, and with deliberate premeditated malice did kill and murder one Jeffrey Wroten, in the perpetration of a felony to-wit: Robbery as defined in Criminal Law Article 3–402 ..., contrary to the form of the Act of Assembly...." Crim. Law § 2–201(a) provides, "A murder is in the first degree if it is ... (4) committed in the perpetration of or an attempt to perpetrate: ... (ix) robbery under § 3–

402 or § 3–403 of this article[.]"[6] Crim. Law § 3–402(a) provides, "A person may not commit or attempt to commit robbery." Crim. Law § 3–402 appears in Crim. Law Title 3, Subtitle 4 "Robbery." Under that same Subtitle, § 3–401 provides:

(a) In this subtitle the following words have the meanings indicated.

\* \* \*

(e) *Robbery.*—"Robbery" retains its judicially determined meaning except that:

(1) robbery includes obtaining the service of another by force or threat of force; and

(2) robbery requires proof of intent to withhold property of another:

(i) permanently;

(ii) for a period that results in the appropriation of a part of the property's value;

(iii) with the purpose to restore it only on payment of a reward or other compensation; or

(iv) to dispose of the property or use or deal with the property in a manner that makes it unlikely that the owner will recover it.

"Robbery," in Crim. Law § 3–402(a), clearly refers to robbery as defined by § 3–401(e).

 We turn next to appellant's argument that the prosecution's proof of his escape from the hospital as a predicate for felony murder did not prove his escape from a "correctional institution," as charged in the indictment for felony-murder.

---

**6.** Crim. Law § 3–403 provides:

**Robbery with dangerous weapon.**
(a) *Prohibited.*—A person may not commit or attempt to commit robbery under § 3–402 of this subtitle:
(1) with a dangerous weapon; or
(2) by displaying a written instrument claiming that the person has possession of a dangerous weapon.
(b) *Penalty.*—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

He draws a distinction between Count Seven, which charges a first-degree escape under Crim. Law § 9–404 from a "State Correctional Facility, a place of confinement," terms which would include the hospital, and Count Two, which cites as the predicate crime for felony murder only an escape from "a correctional institution[.]" [7] Arguing that a "correctional institution" excludes the hospital, appellant contends that the prosecution, for purposes of Count Two, did not place him on notice of a charge of escape from a "place of confinement" and, therefore, did not prove the predicate felony for the felony murder alleged. The State responds that, insofar as appellant challenges the sufficiency of notice given by the presentment, he waived that issue by not requesting a bill of particulars under Rule 4–241. Moreover, the State argues that the prosecution sufficiently proved an escape from the correctional institution that had constructive custody over appellant while he was in the hospital.

Not only was this issue not preserved for our review, it would fail on the merits. Crim. Law § 9–404 addresses "[e]scape in the first degree." Section 9–404(a), at the pertinent subpart, provides, "A person may not knowingly escape from a place of confinement." Crim. Law § 9–401(f) defines "place of confinement" as, among other things, "a correctional facility" and "any other facility in which a person is confined under color of law." Crim. Law § 9–401(a) provides, " 'Escape' retains its judicially determined meaning."

Under Maryland law, "the physical act of escape is the unauthorized departure from lawful custody." *Farris v. State*, 351 Md. 24, 29, 716 A.2d 237 (1998) (citing *Stewart v. State*, 275 Md. 258, 273, 340 A.2d 290 (1975)). The Court of Appeals has construed "lawful custody" to include both actual

---

**7.** In Count Two, the grand jury "present[ed] that Brandon Morris ... feloniously, willfully and with deliberate premeditated malice did kill and murder ... Jeffrey Wroten, in the perpetration of a felony, to-wit: Escape in the First Degree from a State Correctional Facility as defined in Criminal Law Article 9–404 of the Annotated Code of Maryland, contrary to the form of the Act of Assembly...." The count cites Crim. Law § 2–201(a)(4)(v).

custody and "constructive custody." *Id.* at 30, 716 A.2d 237. A person is in "constructive custody" when "temporarily permitted to leave while still lawfully committed to that institution." *Id.* at 29–30, 716 A.2d 237 (citing *Stewart*, 275 Md. at 272, 340 A.2d 290). Accordingly, "a person's departure from constructive custody is the legal equivalent of an escape from the actual place of confinement." *Id.* at 28, 716 A.2d 237. In other words, "Maryland draws no distinction between an escape from within the prison walls and one effected when the prisoner, while still in legal custody, was physically outside the prison area." *Ford v. State*, 237 Md. 266, 270, 205 A.2d 809 (1965).

In *Best v. Warden*, 235 Md. 633, 201 A.2d 490 (1964), where an inmate escaped from a hospital while his guard was arranging transport back to the penitentiary, the "escape from the hospital was an escape from the penitentiary where he had been committed." *Slagle v. State*, 243 Md. 435, 437, 221 A.2d 641 (1966) (summarizing *Best, supra*). In *Johnson v. State*, 196 Md. 672, 75 A.2d 843 (1950), an inmate who walked away from the private farm where he had been assigned to work without a guard was similarly held to have escaped from the institution to which he had been committed because "escape from the farm had no legal significance different from an escape from the Reformatory itself." *Id.* at 674, 75 A.2d 843.

In *Taylor v. State*, 229 Md. 128, 182 A.2d 52 (1962), an inmate who escaped from a work detail while assigned by the House of Correction to a "Correctional Camp" was charged with escaping the House of Correction. The Court of Appeals stated that "the prisoner continued to be under confinement at [the Correctional Camp] and escape therefrom would, therefore, constitute escape from the House of Correction." *Id.* at 130, 182 A.2d 52.

Here, the prosecution proved that appellant, an inmate of RCI, was still in legal custody while at the hospital. The prosecution also proved facts from which the jury could reasonably infer that appellant killed Officer Wroten in his effort to escape legal custody, and, for the period of time between

the shooting and the time when appellant was apprehended, did escape that custody.

## IV

### Whether the trial court correctly instructed the jury on escape.

Appellant contends that the trial court incorrectly instructed the jury that, for purposes of first-degree escape, "a correctional facility includes a hospital to which the defendant has been transported for medical treatment during his lawful confinement." He offers the same argument he asserted in support of his motion for acquittal on his conviction for felony-murder based on escape. As we have explained, the trial court's instructions reflected the state of the law and were not incorrect.

## V

### Whether the sentencing court erred by failing to merge appellant's conviction for the first-degree assault of Tina Bussard into the conviction for attempted armed robbery and the first-degree assault of Fultz into the conviction for armed robbery.

Appellant asserts that the Double Jeopardy Clause was violated when he was sentenced for both the first-degree assaults of Tina Bussard and Fultz and for the armed robbery of Fultz and the attempted armed robbery of Tina Bussard. As to each victim, appellant argues that the acts of assault and robbery were part of the same transaction and that the "rule of lenity" required the sentencing court to merge each assault conviction into its corresponding robbery conviction. The State responds that appellant committed each assault in a transaction separate from the corresponding act of robbery and that the sentencing court, therefore, did not violate appellant's right to be sentenced only once for each crime.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution [8] and the common law of Maryland guard against "multiple punishments for the same conduct, unless the legislature clearly intended to impose multiple punishments." *Jones v. State,* 357 Md. 141, 156, 742 A.2d 493 (1999). To evaluate the legality of the imposition of separate sentences for the same act, we look first to whether the charges "arose out of the same act or transaction," then to whether "the crimes charged are the same offense," *id.* at 157, 742 A.2d 493, and then, if the offenses are separate, to whether "the Legislature intended multiple punishment for conduct arising out of a single act or transaction which violates two or more statutes...." *Id.* at 163, 742 A.2d 493.

The "same act or transaction" inquiry often turns on whether the defendant's conduct was "one single and continuous course of conduct," without a "break in conduct" or "time between the acts." *Purnell v. State,* 375 Md. 678, 698, 827 A.2d 68 (2003). The burden of proving distinct acts or transactions for purposes of separate units of prosecution falls on the State. *Snowden v. State,* 321 Md. 612, 618, 583 A.2d 1056 (1991). Accordingly, when the indictment or jury's verdict reflects ambiguity as to whether the jury based its convictions on distinct acts, the ambiguity must be resolved in favor of the defendant. *Williams v. State,* 187 Md.App. 470, 477, 979 A.2d 184, *cert. denied,* 411 Md. 602, 984 A.2d 245 (2009); *Jones v. State,* 175 Md.App. 58, 88, 924 A.2d 336 (2007), *aff'd,* 403 Md. 267, 941 A.2d 1082 (2008); *Gerald v. State,* 137 Md.App. 295, 312, 768 A.2d 140, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001).

As this Court has previously held, first-degree assault is "a lesser included offense of robbery with a dangerous and

**8.** The Double Jeopardy Clause provides, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V. The Clause applies to the States by operation of the Fourteenth Amendment. *Hubbard v. State,* 395 Md. 73, 88, 909 A.2d 270 (2006).

deadly weapon." *Williams,* 187 Md.App. at 476, 979 A.2d 184 (citing *Gerald,* 137 Md.App. at 312, 768 A.2d 140). The dispositive inquiry is whether appellant's first-degree assault convictions were distinct acts or whether they arose out of the acts of armed robbery against Tina Bussard and Fultz.

*A. The sentence for the assault and robbery of Tina Bussard*

Count Fourteen of the presentment charged appellant with "assault[ing] Tina Marie Bussard in the first degree in violation of [Crim. Law § ] 3–202...." Count Sixteen charged him with attempting to rob her with a dangerous weapon, "to wit: [a] revolver," in violation of Crim. Law § 3–403. The court instructed the jury on first-degree assault as follows:

> The defendant is charged with a crime of first degree assault. In order to convict the defendant of first degree assault, the State must prove all the elements of second degree assault, and must also prove that the defendant used a firearm to commit the assault, or the defendant intended to commit serious physical injury, in the commission of the assault.

The court instructed the jury on armed robbery and attempt as follows:

> In order to convict the defendant of robbery, the State must prove that the defendant took ... the property from the victim's control. That the defendant took the property by force or threat of force, and that the defendant intended to deprive the victim of the property.
>
> The defendant is charged with the crime of robbery with a dangerous weapon. In order to convict the defendant of robbery with a dangerous weapon, the State must prove all of the elements of robbery, and must also prove that the defendant committed the robbery by using a dangerous weapon.
>
> Attempt is a substantial step beyond mere preparation towards the commission of a crime. In order to convict the defendant of attempted robbery ..., the State must prove that the defendant took a substantial step beyond mere

preparation ... toward the commission of the crimes of attempted robbery .... [a]nd that the defendant intended to—to commit the crimes of attempted robbery[.]

The verdict sheet posed the following questions pertaining to the first-degree assault and attempted armed robbery charges relating to Bussard:

*Question # 14*
First degree assault on Tina Bussard: _____ X

Not Guilty Guilty
If you find the defendant guilty on Question # 14, go on to Question # 16.

* * *

*Question # 16*
Attempted Armed Robbery of Tina Bussard: _____ X

Not Guilty Guilty

We have addressed similar facts as we have here in cases involving the merger of the common-law crime of assault (now superseded by statute, *Robinson v. State,* 353 Md. 683, 702, 728 A.2d 698 (1999)), into the crime of robbery. In *Beard v. State,* 42 Md.App. 276, 399 A.2d 1383 (1979), the defendants broke into a house, held one occupant at gunpoint, bound both occupants, and stole property. We concluded that the assaults were "part and in furtherance of" the robbery convictions and noted that there was no evidence of "any independent assault." *Id.* at 280, 399 A.2d 1383. Therefore, we held that the convictions for assault should have been merged under those of the robbery and reversed the convictions and sentences for assault. *Id.* In *Melville v. State,* 10 Md.App. 118, 268 A.2d 497 (1970), in which the defendant and the victim, a draft board employee, struggled over a basket of induction files, we noted that the "element of violence in the robbery" was the same act from which the conviction for the assault arose and held that the offenses merged. *Id.* at 126, 268 A.2d 497. Similarly, the offense of assault with a dangerous weapon merged into armed robbery in *Baynard v. State,* 2 Md.App. 701, 704, 237 A.2d 71 (1968), where the defendant robbed a liquor store owner and then left the premises. In contrast, the crimes did not merge in *Matthews v. State,* 68 Md.App. 282, 303, 511 A.2d 548, *cert. denied,* 308 Md. 238, 517 A.2d 1121 (1986), where the

defendant instructed his cohorts to take property from one room while he assaulted the victim in another. Here, the record does not reflect a break in appellant's acts with regard to Bussard, who testified that appellant threatened her with a gun, demanded her money and keys, and pulled her from Room 5007 while she was holding her pocketbook.

The State argues that the jury could have inferred from evidence introduced at trial that appellant's assault of Tina Bussard was an act distinct from his attempt to rob her at gunpoint. However, we have explained that "any ambiguity in the indictment or as to how the jury understood the charges must be resolved in [the defendant's] favor." *Gerald,* 137 Md.App. at 312, 768 A.2d 140 (citing *Snowden,* 321 Md. at 618–19, 583 A.2d 1056). In *Gerald,* we stated:

> The court instructed the jury on the elements of each charge, but it did not explain how the assault and robbery charges related to one another, how they differed, and what the jury needed to find to convict under both charges. *See Graham v. State,* 117 Md.App. 280, 289, 699 A.2d 1204 (1997) (no ambiguity where the court clearly explained the difference between the two counts at issue); *Cortez v. State,* 104 Md.App. 358, 369, 656 A.2d 360 (1995) (advising courts on how to instruct juries to avoid merger problems). With an ambiguity in the indictment, and non-curative instructions, the first degree assault conviction must indeed merge into the robbery conviction.

*Id.*

We addressed this argument again in *Williams,* 187 Md. App. at 477, 979 A.2d 184, where the evidence established that the defendant pointed his gun at the victim in her house, hit her with his gun, ordered others to tie her up, continued to point his gun at her while others went through her possessions downstairs for ten to fifteen minutes, threatened her not to call the police, and left. *Id.* at 473, 979 A.2d 184. The *Williams* indictment did not charge assault based upon acts separate and distinct from the acts upon which the robbery charge was based, nor did the jury instructions require the

jury to make separate findings of fact as related to each charge. *Id.*

In *Williams,* the State contended that, "because 'there was evidence from [which] the jury could infer that [the victim] was assaulted in the first degree based on conduct separate and distinct from the conduct that established the ... robbery' with a dangerous and deadly weapon, the offenses do not merge." *Id.* at 477, 979 A.2d 184. Finding the State's argument "unpersuasive," *id.,* we stated:

> [Defendant's] charging document is ambiguous as to the particular act for which he was charged with first degree assault of [victim]. *See Gerald,* 137 Md.App. at 312, 768 A.2d 140 (a conviction for first degree assault merges into a conviction for robbery with a dangerous and deadly weapon when the charging document is ambiguous as to the particular act alleged to have constituted first degree assault). Moreover, the court did not instruct the jury as to "how the assault and robbery charges related to one another, how they differed, and what the jury needed to find to convict under both charges." *Id.* (citations omitted). In light of the court's failure to give curative instructions, and the ambiguity of [defendant's] charging document, we must resolve the question of whether the charges of robbery and assault of [victim] were based upon the same conduct in [defendant's] favor. *Id.* ("[A]ny ambiguity in [a charging document] or as to how the jury understood the charges must be resolved in [the defendant's] favor." (citation omitted)).

*Id.*

On the other hand, in *Graham v. State,* 117 Md.App. 280, 699 A.2d 1204, *cert. denied,* 348 Md. 206, 703 A.2d 147 (1997), we upheld separate assault sentences because the trial court had instructed the jury on the two distinct assaults with which the defendant had been separately charged, and the verdicts on the separate counts evidenced the jury's finding of distinct acts. *Id.* at 288–90, 699 A.2d 1204.

**44**

■ Here, neither the charging document nor the jury instructions made clear that the charges of assault were based upon separate and distinct acts from those upon which the robbery charges were based. In accordance with *Gerald* and *Williams,* and in light of similar ambiguities reflected in the record, we hold that appellant's first degree assault of Tina Bussard merged into the attempted armed robbery conviction, and the sentence imposed for the first degree assault must be vacated.

*B. The sentences for the assault and robbery of Fultz*

■ Count Twenty–Four of the presentment charged appellant with "assault[ing] Frank Fultz in the first degree in violation of [Crim. Law § ] 3–202. . . ." Count Twenty–Five charged appellant with robbing Fultz of money with a dangerous weapon, "to wit: [a] revolver," in violation of Crim. Law § 3–403.

The verdict sheet posed the following questions pertaining to the charged crimes against Fultz:

*Question # 24*
First degree assault on Frank Fultz: _____ X

Not Guilty Guilty

If you find the defendant guilty on Question # 24, go on to Question # 26.
. . . .

. . . .
*Question # 26*
Armed Robbery of Frank Fultz: _____ X

Not Guilty Guilty

The evidence might have permitted the jury to find that appellant continued his assault of Fultz after the robbery, but the presentment did not allege an assaultive act separate from that done in furtherance of the robbery, the jury was not instructed to reach a verdict on a separate act of assault, and the verdict form conditioned the robbery verdict on the assault verdict. Here, like the *Williams* and *Gerald* charging documents, the presentment "is ambiguous as to the particular act for which he was charged with first degree assault of [the

victim]." *Williams*, 187 Md.App. at 477, 979 A.2d 184. Again, we must resolve the conflict in appellant's favor and merge the assault into the armed robbery and vacate the sentence imposed for the assault conviction.

SENTENCES FOR THE FIRST DEGREE ASSAULT OF VICTIMS BUSSARD AND FULTZ VACATED; JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED IN ALL OTHER RESPECTS. COSTS TO BE PAID EIGHTY PERCENT BY APPELLANT AND TWENTY PERCENT BY HOWARD COUNTY.